**UNITED RUBBER, CORK, LINOLEUM & PLASTIC WORKERS OF AMERICA, AFL-CIO, CLC, et al.**

v.

**PIRELLI ARMSTRONG TIRE CORPORATION, et al.**

No. 3:94-0573.

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 9, 1994.

George Edward Barrett, Phillip A. Purcell, Barrett, Johnston & Parsley, Nashville, TN, Charles R. Armstrong, Carolyn T. Wonders, Gen. Counsel, URW, Akron, OH, for plaintiffs.

Charles Hampton White, Cornelius & Collins, Nashville, TN, Bettina B. Plevan, Edward A. Brill, Proskaver, Rose, Goetz & Mendelsohn, New York City, for Pirelli Armstrong Tire Corp.

Bettina B. Plevan, Edward A. Brill, Proskaver, Rose, Goetz, Mendelsohn, New York City, for Plan Admin., Pension & Bene. Plans Committee.

### MEMORANDUM

JOHN T. NIXON, Chief Judge.

In this action, Plaintiffs challenge the legality of Defendants' decision to terminate retiree health benefits. Beginning November 4, 1994, the Court conducted a non-jury trial on Plaintiffs' claims. Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. Background

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. Pirelli Armstrong Tire Corporation ("PATC") is a Delaware corporation headquartered in New Haven, Connecticut, engaged in the production of automobile tires, light truck tires, inner tubes and bladders at three manufacturing plants located in the United States. PATC employs approximately 1,600 workers. (Tr. 397–98.)

3. Pirelli Tire Holding ("PTH"), which is a company based in Amsterdam, Holland, owns PATC. PTH acquired Armstrong Tire & Rubber Co., PATC's predecessor, in 1988. (Tr. 399.)

4. PATC now operates manufacturing plants in Nashville, Tennessee; Hanford, California; and Little Rock, Arkansas. (Tr. 398.) In the past, PATC, or its predecessors, operated plants in Des Moines, Iowa; Natchez, Mississippi; and West Haven, Connecticut. (Tr. 287–88; 407–408; Pls. Ex. 26(3), p. 3.)

5. The United Rubber, Cork, Linoleum and Plastic Workers of America ("URW") is an unincorporated labor organization headquartered in Akron, Ohio. URW and its affiliated local unions have, at all relevant times, been the collective bargaining repre-

sentative of the hourly employees at PATC's manufacturing facilities. The URW has also served as the representative of PATC's hourly retirees in bargaining with PATC concerning the health care benefits provided by PATC to members of the class. (Stipulations No. II ¶ II.)

6. URW Local 164, URW Local 670, and URW Local 703 are unincorporated labor organizations whose principal place of business are located in Des Moines, Iowa; Nashville, Tennessee; and Hanford, California, respectively.

7. The URW and PATC[1] have entered into collective bargaining agreements ("CBA") and Employee Benefit Agreements ("EBA") in the years 1957, 1959, 1964, 1967, 1970, 1973, 1976, 1979, 1982, 1985, 1988 and 1991. (Stipulations No. II ¶ II.)

8. Pursuant to the EBAs referenced above in ¶ 7, PATC sponsored one or more Plans to provide medical benefits to its employees and retirees. (Stipulations No. II ¶ III.) The Plan or Plans are Welfare Benefit Plans within the meaning of the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Stipulations No. II ¶ IV.)

9. In 1991, the URW and PATC entered into a CBA and EBA. (Stipulations No. II ¶ VII.)

10. On or about July 8, 1994, PATC, via letter, notified its hourly-rated retirees that it was unilaterally modifying or eliminating their benefits. (Stipulations No. II ¶ VIII.) On July 15, 1994, the CBA between PATC and the URW terminated. (Tr. 31.)

11. The decision to modify the participants' medical plan coverage was made without the consent of the URW or the retiree/participants represented by the individual Plaintiffs. (Stipulations No. II ¶ IX.)

B. *Facts Relevant to Claims*

12. The Court finds that throughout the years, PATC represented to its employees and retirees that retiree health benefits would be provided for life. The Court fur-

ther finds that paragraphs 13–31 are examples of such representations.

13. In 1955, PATC negotiated an EBA which covered only its employees at the New Haven, Connecticut facility. The EBA provided health care benefits to its retired hourly employees. (Defs. Ex. HH, § 14.02.)

14. In 1957, PATC negotiated an EBA which covered only its employees at the Natchez, Mississippi facility. This EBA was closely patterned after the 1955 New Haven, Connecticut EBA. (Tr. 43.) The EBA provided health care benefits to its retired hourly employees. (Pls. Ex. 1(a), § 14.02.) During the negotiation of this EBA, PATC represented to the union that the terms of the EBA provided lifetime health benefits to retirees. (Tr. 47.)

15. In 1959, PATC negotiated its first master EBA which covered employees at its facilities in New Haven, Connecticut; Natchez, Mississippi; Des Moines, Iowa; and Norwalk, Connecticut. (Pls. Ex. 1(b); Tr. 48–49.) During the negotiation of this EBA, PATC represented to the union that the terms of the EBA provided lifetime health benefits to retirees. (Tr. 53.)

16. During this same time, PATC developed an "exit interview" procedure. (Tr. 54–56.) Under this procedure at the Natchez facility, a prospective retiree met with PATC representatives and the URW. (*Id.*) PATC representatives explained the employee's pension options and advised the prospective retiree of his or her right to lifetime health coverage. (*Id.*) This procedure continued up until the sale of the Natchez facility in 1987. (*Id.*)

17. During the negotiation of the 1959 EBA, the parties discussed the termination clause of the EBA. (Tr. 53–54.) The clause was drafted to protect the union's right to strike over issues not covered by the EBA. (*Id.*)

18. In 1964, PATC negotiated an EBA with its employees which provided health care benefits to its retired hourly employees

---

1. The Court recognizes that PATC did not exist as an entity until 1988. Therefore, the Court notes that when it refers to PATC's actions which

occurred prior to 1988, it is referring to PATC and its predecessors.

and their surviving spouses. (Pls. Ex. 1(c), §§ 14.02 & 14.03.) During the negotiation of this EBA, PATC and the URW agreed to contract language limiting a retiree's surviving spouse's entitlement to medical coverage to his or her lifetime or until he or she remarried. (Tr. 59.) Harold Hoppert and Robert Millar, former Vice–Presidents for Human Resources at PATC, testified that PATC never intended to give greater benefits to spouses of retirees than to retirees. (Pls. Ex. 26(1) at 44 and 26(2) at 16.)

19. In 1967, PATC and URW negotiated an EBA which provided health care benefits to its retired hourly employees and their surviving spouses. (Pls. Ex. 1(d), §§ 14.02 & 14.03.) These provisions were unchanged from the 1964 EBA. (*Id.*)

20. Until 1967, PATC and URW had negotiated master CBAs which expired in different years than the EBAs. At this time, PATC proposed establishing common expiration dates for CBAs and EBAs. As a result, the URW insisted on an "umbrella clause." The outcome was the insertion of § 18.04 to the 1967 EBA. This section provided medical coverage to employees engaged in a lawful strike for 90 days following the expiration of the agreement. This provision was never applied to retirees during any strike. Retirees never lost any benefits while active employees were on strike. (Tr. 65–70.)

21. The language of § 18.04 of the 1967 EBA is virtually identical in all respects to § 24.04 of the 1991 EBA.

22. In 1981, PATC closed its facility in New Haven, Connecticut. (Stipulations No. II ¶ V.) Prior to closing it, PATC prepared a script to be read to all retiring employees. (Pls. Ex. 26(3) at 35–36.)

23. Joseph Colantoino, Industrial Relations Manager at the New Haven facility, told the facility's employees that if they were fifty-five years old or had twenty-five years of service, they and their spouses were entitled to the benefits for the rest of their life. (*Id.* at 32–33.)

24. In addition, all New Haven retiring employees were given a benefits form during their retirement interviews which indicated that they would be provided medical cover-

age for life at no cost to them. (*Id.* at 25–29.)

25. To this date, PATC has continued to pay the medical benefits of its New Haven, Connecticut retirees even though the facility is no longer owned or operated by PATC and the retirees are no longer referenced in the EBAs. (Stipulations No. II ¶ X.)

26. In 1987, PATC sold its facility in Natchez, Mississippi. (Stipulations No. II ¶ VI.) Prior to the sale, PATC negotiated a close-out agreement with the union. (Tr. 287–288.)

27. During the interviews with retiring employees, PATC provided each with a benefits form which indicated they would receive medical benefits at no cost to them. (Pls. Ex. 2(a).) In this benefits form and in the closure agreement, PATC extended 24 months of vision care to retiring employees in addition to the medical coverage to which they were entitled. (Pls. Ex. 2(a) and 24(a).) No such time limit was set for the other medical benefits. (*Id.*)

28. To this date, PATC has continued to pay the medical benefits of its Natchez, Mississippi retirees even though the facility is no longer owned or operated by PATC and the retirees are no longer referenced in the EBAs. (Stipulations No. II ¶ X.)

29. In 1987, PATC threatened to close its Des Moines facility. (Tr. 211.) The closure was averted when the union agreed to a concessionary agreement to make the plant competitive. (Tr. 214.) A part of the concessionary agreement included an lower quality medical program for the remaining employees, but it was not applicable to existing retirees. (Tr. 214–15.) Existing employees who were eligible for retirement were given an option to retire under the then existing medical plan. (Tr. 216.) Approximately 100 employees took advantage of this option of early retirement. (Tr. 221.) Based upon an agreement with the union, PATC met with every pension-eligible employee in the plant. PATC representatives explained all pension options to employees and specifically informed them that they were entitled to medical coverage during the term of their retirements. (Tr. 216–21.)

30. In 1988, PATC issued and distributed an Employee Benefits Handbook. (Pls. Ex. 5.) The Handbook outlined the medical benefits to which retirees and their dependents and surviving spouses were entitled. (*Id.* at 5–7.) Specifically, it stated that medical benefits "will be provided" for retirees and that surviving spouses of retirees will receive coverage until they "remarr[y] or die." (*Id.*)

31. In the normal course of business at PATC's Nashville, Tennessee facility, PATC conducts exit interviews with prospective retirees. (Tr. 132.) During these interviews, PATC represents to prospective retirees that their medical benefits are for life. (Tr. 133.)

32. In the normal course of business at PATC's Nashville, Tennessee facility, when a retiree dies leaving a surviving spouse, PATC meets with them and informs surviving spouses that their medical benefits will continue until death or remarriage. (Tr. 137–138.)

33. In 1991, the URW and PATC entered into a CBA and EBA. (Stipulations No. II ¶ VII.) Like previous EBAs, the 1991 EBA provided health benefits to its retirees and their surviving spouses. (Pls. Ex. 26(1)(c) §§ 12.07 & 12.08.)

34. The language of the 1991 EBA is ambiguous as to the duration of the retirees' benefits. The following paragraphs are examples of such inconsistencies in the 1991 EBA.

35. The preamble to Article XVI, the Master Medical Plan, states that the Plan is "[e]ffective as of January 1, 1992, and for the duration of this Agreement thereafter." (Pls. Ex. 26(1)(c) at 131.)

36. The preamble to Article XVII, the Basic Medical and Major Medical Benefits Plans, states that the Plans are "[e]ffective as of July 15, 1991, and for the duration of this Agreement thereafter." (Pls. Ex. 26(1)(c) at 153.)

37. The preamble to Article XIX, the Comprehensive Health Care Benefits Plan, states that the Plan is "[e]ffective as of July 15, 1991, and for the duration of this Agreement thereafter." (Pls. Ex. 26(1)(c) at 232.)

38. Article XV, which details the prescription drug benefits, states that such benefits are "[e]ffective as of July 15, 1991, and for the duration of this Agreement thereafter." (Pls. Ex. 26(1)(c), § 15.01 at 128.)

39. Section 24.04 of the 1991 EBA provides that the agreement "terminates in all respects" on July 15, 1994, with the sole exception that PATC must continue to provide benefits under the agreement for 90 days after the agreement terminates. (Pls. Ex. 26(1)(c), § 24.04.)

40. However, the Special Medicare Benefits provision of the 1991 EBA provides that "the payment of such Benefit shall continue until the individual's death or, for an individual under sixty-five (65) years of age, until he is no longer eligible to participate in Part B of Medicare as the primary coverage." (Pls. Ex. 26(1)(c) § 6.10(c).)

41. The Special Medicare Benefits provision provides that "upon the death of a Retiree or Employee, the Special Medicare Benefit will be paid to his surviving spouse if such spouse is eligible to receive Health Care Expense Benefits under Part III of this Agreement. Such surviving spouse shall continue to receive the Special Medicare Benefit until such spouse remarries, dies or is no longer eligible for Part B of Medicare." (Pls. Ex. 26(1)(c) § 6.10(e).)

42. Under the 1991 EBA, retired employees, based on their age and/or the number of years of service, receive certain medical benefits. (Pls. Ex. 26(1)(c) § 12.07.) Unlike similar sections, section 12.07, which covers retired employees, contains no termination or duration provision. For example, §§ 12.03, 12.04, 12.05, and 12.06 specifically consider the duration of benefits for dependents, laid off employees, employees on leave of absence and injured employees. (Pls. Ex. 26(1)(c).)

43. Under the 1991 EBA, surviving spouses of retired employees "shall be entitled to continue to receive health care benefits until death or remarriage under the exact same conditions and amounts that such surviving spouse was entitled." (Pls. Ex. 26(1)(c) § 12.08.)

## II. CONCLUSIONS OF LAW

### A. *Plaintiffs' Contract Claim Under § 301 of LMRA and ERISA*

#### 1. Legal Standard

■ Plaintiffs contend that Defendants breached their contract in violation of Section 301 of the Labor Management Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3). Plaintiffs may sue to recover benefits due under a plan, to enforce their rights under a plan, or to clarify their rights to future benefits. *See Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 53, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39, 51 (1987). The enforcement and interpretation of collective bargaining agreements under § 301 of LMRA is governed by substantive federal law. *International Union, United Auto., Aero., Agri. Workers of Am. (UAW) v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983) *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234.

■ ERISA distinguishes between employee pension plans and employee welfare plans. *Gill v. Moco Thermal Indus., Inc.*, 981 F.2d 858, 860 (6th Cir.1992). Pension plans provide for vested benefits, but with welfare plans, i.e. health insurance, there is no vesting requirement under ERISA. *Id.* As with any contract, however, the parties to a welfare benefit plan may agree to the vesting of health insurance coverage for retirees under an ERISA plan. *Id.* In addressing a claim for vested retiree health benefits, the court must look to the intent of the parties and apply federal common law of contracts to determine if the benefits are vested. *Gill* 981 F.2d at 860; *Yard–Man*, 716 F.2d at 1479.

■ Initially, the Court must look to the explicit language of the agreement for clear manifestations of intent. *Id.* However, where ambiguities exist, the Court may look to extrinsic aids, i.e. the bargaining history. *See Cincinnati Typographical Union No. 3 v. Gannett Satellite Information Network, Inc.*, 17 F.3d 906, 910 (6th Cir.1994); *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993) *cert. denied* — U.S. —, 114

S.Ct. 291, 126 L.Ed.2d 240 (1993) (holding that if a collective bargaining agreement is ambiguous with respect to vesting, a court properly should resort to extrinsic evidence). The Court should interpret each provision as part of the integrated whole. *Yard–Man*, 716 F.2d at 1479. As with all contracts, the agreement's terms "must be construed so as to render none nugatory and avoid illusory promises." *Id.* at 1480.

■ The Court recognizes that retiree benefits are permissive, not mandatory, subjects of collective bargaining. *Yard–Man*, 716 F.2d at 1482. However, it has been recognized that the Sixth Circuit in *Yard–Man* adopted the "weak vest rule" which presumes that benefits vest unless there is evidence of an agreement to the contrary. *See Helwig v. Kelsey–Hayes Co.*, 857 F.Supp. 1168, 1176 (E.D.Mich.1994); *Hinckley v. Kelsey–Haves Co.*, 866 F.Supp. 1034, 1038–39 (E.D.Mich.1994); *Bidlack*, 993 F.2d at 613. As the Sixth Circuit noted, "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard–Man*, 716 F.2d at 1482. Retiree benefits are in a sense "status" benefits which carry with them an inference that they continue so long as the prerequisite status, i.e. retirement, is maintained. *Id.* Moreover, the finding of an intent to create interminable rights to retiree benefits in the absence of explicit language is not inconsistent with federal labor law. *Id.* The Court realizes, however, that this factor alone is an insufficient basis for finding an intent to create interminable benefits. *Id.* Instead, this factor may support the already sufficient evidence of such intent. *Id.*

#### 2. Application of Legal Standard to Facts

■ Plaintiffs contend that PATC breached the EBA with its decision to terminate retiree benefits. As noted above in the Findings of Fact, upon reviewing the 1991 EBA, the Court concludes it is ambiguous. Several of its provisions contradict one another. One group of provisions in the 1991 EBA suggest that retiree benefits terminate when the agreement terminates. For example, the preamble to Article XVI, the Master

Medical Plan, states that the Plan is "effective as of January 1, 1992, and for the duration of this Agreement thereafter." The preambles to Articles XVII and XIX state that the Plan or Plans are "effective as of July 15, 1991, and for the duration of this Agreement thereafter." Also, Section 24.04 provides that the agreement "terminates in all respects" on July 15, 1994. These provisions suggest that the retiree health care benefits terminate on July 15, 1994.

However, there are other provisions within the 1991 EBA which contradict these provisions. For instance, Section 6.10, the Special Medicare Benefits provision provides that "the payment of such Benefit shall continue until the individual's death, or for an individual sixty-five (65) years of age, until he is no longer eligible to participate in Part B of Medicare as the primary coverage." Moreover, this same provision provides that upon the death of a retiree, this benefit will be paid to the surviving spouse until the spouse remarries, dies or is no longer eligible for Part B of Medicare. Also, under the 1991 EBA, there is no termination language in Section 12.07, which provides for retiree medical benefits. In contrast, Sections 12.03, 12.04, 12.05 and 12.06 specifically address the duration of benefits for dependents, laid off employees, employees on leave of absence and injured employees. Finally, under Section 12.08, surviving spouses of retired employees are entitled to receive health care benefits until death or remarriage.

In reviewing the 1991 EBA as a whole, the Court concludes it contains provisions which are conflicting as to the duration of retiree medical benefits. Therefore, the Court will look to the extrinsic evidence presented to determine the intent of the parties. *See Cincinnati Typographical Union,* 17 F.3d at 910. Upon reviewing the 1991 EBA and the extrinsic evidence, the Court concludes that the underlying intent of the parties was for the benefits at issue to vest upon retirement. Along with this general conclusion, the Court makes the following specific conclusions about the provisions of the 1991 EBA and the context in which it arose.

First, the Court concludes that the inclusion of specific durational limitations in other provisions of the EBA, i.e., the provisions concerning benefits for dependents, laid off employees, employees on leave of absence and injured employees, suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of the CBA on July 15, 1994. *See Yard–Man,* 716 F.2d at 1482; Pls.Ex. 26(1)(c), §§ 12.03–12.08.

Second, the Court concludes that Section 12.08, which provides for health benefits to continue until the surviving spouse's death or remarriage, suggests that retirees were to have health benefits until their death. Defendants argue that language in Section 12.08 which states that surviving spouses receive benefits under the "exact same conditions and amounts" that the retirees were entitled to before their death, limits the duration of the surviving spouses' benefits to the expiration of the contract. The Court notes that Defendants' position is one plausible reading of Section 12.08; however, with the other inconsistencies and ambiguities in the 1991 EBA, another equally plausible reading is that the surviving spouses of retirees have health benefits for life and therefore, so do the retirees. In light of the extrinsic evidence, i.e., the representations made by PATC to its employees and/or retirees over the years, the Court concludes that the intent of the parties was for surviving spouses of retirees to have health benefits for life. Moreover, evidence presented suggests that PATC never intended to give greater benefits to spouses of retirees than to retirees. (*See supra* Part I, ¶ 18.)

Third, the Court concludes that if PATC could terminate retiree benefits at the expiration of the CBA, certain promises made by PATC would be illusory. *See Yard–Man,* 716 F.2d at 1481. Under Section 6.10 of the Plan, PATC promises to make certain Medicare payments when a retiree becomes eligible for Medicare. (*See supra,* Part I, ¶ 40.) If the benefits are terminable as PATC argues, then PATC's promise to make such payments is completely illusory to those retirees not yet eligible for Medicare. Moreover, a letter dated July 15, 1991, from PATC to the URW, provides that no retiree shall be required to make contributions to their medicare benefit premiums until 1997.

(Pls. Ex. 26(1)(c), Letter # 8, at 330.) Again, if the benefits are terminable as PATC asserts, then PATC's promise in Letter # 8 is illusory.

Fourth, the Court concludes that Section 24.04, the general durational clause, in and of itself, does not support a finding that retiree benefits terminate when the CBA expires. Section 24.04 provides that "[u]pon termination, this Agreement shall terminate in all respects, except that the benefits provided by it shall be extended for ninety (90) days following such termination." The Sixth Circuit has repeatedly held that a general duration or termination clause ending the collective bargaining agreement as of a certain date did not demonstrate an intent that all benefits described in the agreement terminate as of that date. *See Yard–Man,* 716 F.2d at 1482–83; *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669 (6th Cir.1985). In *Weimer,* as in this case, the employer terminated its retirees' benefits when the CBA terminated. The termination clause in the CBA provided that "all terms and conditions hereof shall terminate as of the end of the term in which such a [60 day] notice was given." *Weimer,* 773 F.2d at 675. The Sixth Circuit held that in light of the parties' failure to specify that retiree insurance benefits expired with the termination of the CBA, then the general termination clause does not support a finding that retiree benefits ended when the CBA expired. *Id.* at 676. Likewise, in this case, the parties failed to specifically indicate that the retirees' benefits expired with the termination of the CBA. Moreover, as stated above, there were provisions which suggest the contrary—that the retirees' benefits continued for life.

Finally, the Court concludes that the examination of the context in which these benefits arose demonstrates the probability that continuing health benefits for retirees were intended. *See Yard–Man,* 716 F.2d at 1482. The Court recognizes that the Sixth Circuit presumes that benefits vest unless there is evidence of agreement to the contrary. *See Yard–Man,* 716 F.2d 1476. However, the Court also recognizes that the Sixth Circuit holds that this "context" factor alone, is in-

sufficient to find an intent to create interminable benefits. *Id.* at 1482. The Court concludes that the extrinsic evidence, specifically, the representations made over the years to employees and retirees that their benefits would continue not only for their lifetime, but for the lifetime of their surviving spouses,[2] supports the conclusions made above that the retiree benefits were intended to last beyond the termination of the plan.

In summary, the Court concludes that the 1991 EBA is ambiguous in that it has conflicting provisions as to the duration of retiree benefits. However, the Court also concludes that the provisions suggesting that the retirees' health benefits were for life and the extrinsic evidence, i.e. the representations, support the Court's finding that the intent of the parties in the 1991 EBA was to provide lifetime benefits for retirees. Thus, the Court concludes that the health benefits of Plaintiff retirees are vested. Moreover, the Court concludes that PATC had no right under the 1991 CBA to terminate Plaintiff retirees' benefits.

### B. *Plaintiffs' Claim for Breach of Fiduciary Duty*

Plaintiffs claim that PATC breached its fiduciary responsibilities by misrepresenting facts to plan participants, failing to make adequate disclosure to participants, failing to act in accordance with terms of plan and failing to act in the best interest of participants.

Upon reviewing the law on this issue, the Court concludes Plaintiffs' claim is without merit. As Defendants recognize, the Sixth Circuit has made clear that an employer's decision to terminate or amend an employee benefit plan is a "settlor function," not subject to ERISA's fiduciary requirements. *See Wulf v. Quantum Chemical Corp.,* 26 F.3d 1368, 1377 (6th Cir.1994), *petition for cert. filed,* 63 U.S.L.W. 3371 (U.S. Oct. 25, 1994) (No. 94–750) (holding that an employer may amend or terminate an employee welfare benefit plan and in doing so, the employer does not act as a fiduciary); *Musto v. American General Corp.,* 861 F.2d 897, 912

---

2. *See supra* Part I, ¶¶ 13–32.

(6th Cir.1988) *cert. denied* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Helwig v. Kelsey–Hayes Co.*, 857 F.Supp. 1168 (E.D.Mich.1994). Therefore, the Court concludes that PATC's decision to terminate the health care benefits of retirees is a settlor function which is not subject to the fiduciary standards imposed by ERISA and as such, PATC did not breach any fiduciary duty.

### C. *Plaintiffs' Equitable Estoppel Claim*

Plaintiffs contend that PATC is estopped from terminating their benefits. As Plaintiffs noted, the estoppel doctrine is applicable to cases arising under § 301 LMRA and ERISA. The Sixth Circuit noted in *Armistead v. Vernitron*, 944 F.2d 1287 (6th Cir.1991), both the LMRA and ERISA authorize the federal courts to fashion a body of federal common law to enforce the agreements that these statutes bring within their jurisdiction. The elements of equitable estoppel are:

1. conduct or language amounting to a representation of material fact;

2. awareness of the true facts by the party to be estopped;

3. an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;

4. unawareness of the true facts by the party asserting the estoppel; and

5. detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Id.* at 944 F.2d at 1298 (citations omitted).

The Court concludes that all of these factors are present in this action. First, the Court finds that PATC has consistently told the retirees that their benefits were for life. Second, by unilaterally terminating the benefits of the retirees, the Court finds that PATC has shown that it has always believed that such benefits were not for life. Third, the Court finds that PATC has acknowledged that it used the benefits as an inducement to employment and as a substitute for present wages. Fourth, the Court finds that the retirees had no knowledge that PATC could terminate their benefits until they received PATC's letter of July 8, 1994. Finally, the Court finds that Plaintiff retirees relied upon the representations by working for PATC, by foregoing present wages for future benefits, and by retiring and not making any other arrangements for health benefits. As the Court finds that all the factors have been met, the Court concludes that PATC is estopped from terminating Plaintiff retirees' benefits.

### D. *Plaintiffs' Claim for Intentional Infliction of Emotional Distress*

In the Complaint, Plaintiffs allege that PATC's conduct in sending a letter to Plaintiffs which informed them of PATC's decision to terminate their medical coverage created mental distress, anguish and emotional suffering among Plaintiffs. (*See* Complaint ¶¶ 36–43.)

As Plaintiffs have failed to proffer any evidence supporting this claim, the Court denies Plaintiffs' state law claim for intentional infliction of emotional distress and accordingly denies Plaintiffs' request for damages for such claim.

### E. *Financial Condition of PATC*

At trial, PATC presented evidence as to its financial condition. Plaintiffs objected to the admission of such evidence because they had been denied the opportunity to adequately respond to such evidence and because they had not been provided the underlying data for such evidence. At that time, the Court reserved judgment as to whether it would consider such evidence if and when it fashioned a remedy for Plaintiffs. While the Court recognizes it has inherent equitable authority, upon reviewing the issue, the Court concludes that it will not consider this evidence in determining the appropriate remedy for Plaintiffs.

### III.  CONCLUSION

For the above stated reasons, the Court declares that Plaintiff retirees are entitled a continuation of the health care benefits in effect or to which they were entitled at the

time of their respective retirements or as subsequently modified by mutual agreement. As such, the Court concludes that PATC is estopped from terminating Plaintiff retirees' benefits. The Court also finds that PATC's decision to terminate the health care benefits is a settlor function which is not controlled by the fiduciary standards imposed by ERISA. Finally, the Court denies Plaintiffs' claim for intentional infliction of emotional distress and therefore denies Plaintiffs' request for damages for this claim.

An Order consistent with the findings herein is filed contemporaneously.

### ORDER

In this action, Plaintiffs challenge the legality of Defendants' decision to terminate retiree health benefits. Beginning November 4, 1994, the Court conducted a non-jury trial on Plaintiffs' claims.

Consistent with the contemporaneously filed Memorandum, the Court finds that Defendants did not have the right under the 1991 CBA to terminate the retirees' benefits unilaterally. The Court finds that Plaintiff retirees are entitled a continuation of the health care benefits in effect or to which they were entitled at the time of their respective retirements or as subsequently modified by mutual agreement. The Court also finds that Defendants' decision to terminate the health care benefits is a settlor function which is not controlled by the fiduciary standards imposed by ERISA and thus, Defendants did not breach any fiduciary duty in terminating the benefits. Finally, the Court denies Plaintiffs' claim for intentional infliction of emotional distress.

Accordingly, the Court hereby ORDERS that Defendants are estopped from terminating Plaintiff retirees' health benefits. However, as Plaintiff retirees' benefits continued throughout this litigation, Plaintiffs have not been damaged in monetary amount except for the cost of litigation. Therefore, the Court hereby ORDERS Plaintiffs to submit a bill of costs to the Court.

Entered this the 9th day of December, 1994.