**PIRELLI ARMSTRONG TIRE
CORPORATION,**
Plaintiff,

v.

**TITAN TIRE CORPORATION,**
Defendant.

No. 95–3347.

United States District Court,
C.D. Illinois,
Springfield Division.

April 24, 1998.

The deal stands.

Judgment for Pirelli Armstrong.

Glen H. Kanwit, Hopkins & Sutter, Chicago, IL, Harold F. McGuire, Jr., Arthur V. Nealon, McGuire, Kehl & Nealon, New York, NY, for Plaintiff.

Delmer R. Mitchell, Schmiedeskamp, Robertson, Neu & Mitchell, Quincy, IL, Gene R. La Suer, Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, IA, Dennis Kayes, Pepper, Hamilton & Scheetz, Detroit, MI, for Defendant.

## OPINION

RICHARD MILLS, U.S. District Judge.

Two large, sophisticated companies made a deal.

But the deal did not turn out as favorably as Titan Tire would have liked.

Titan Tire now wants out.

## INTRODUCTION

Plaintiff Pirelli Armstrong Tire Corporation (Pirelli) sold a tire manufacturing facility in Des Moines, Iowa, to Defendant Titan Tire Corporation (Titan) pursuant to an Asset Purchase Agreement. As part of the deal, Titan agreed to assume Pirelli's liability for certain retiree medical benefits owed to the employees of the Des Moines facility. Several months after taking over the facility, Titan notified Pirelli that it intended to repudiate the medical benefit obligation. This action followed.

At a bifurcated trial on liability, the parties focused exclusively on Titan's affirmative defenses. Titan does not dispute that it agreed to assume liability for the retiree medical benefits. However, Titan argues that Pirelli committed certain misrepresentations and breaches, thereby relieving Titan of its duty to perform. The Court finds that the following facts were proved at trial.

## FACTS

Pirelli is a Delaware Corporation headquartered in New Haven, Connecticut. Titan is an Illinois Corporation and subsidiary of Titan Wheel International, Inc.[1]

For many years, Pirelli and its predecessor, the Armstrong Rubber Company, have operated tire manufacturing plants at various locations in the United States including Des Moines, Iowa. The Des Moines plant produced tires for agricultural equipment, passenger cars, and light trucks.

Pirelli employed a large number of unionized and salaried employees at its facilities, including the one in Des Moines. For many years, Pirelli has provided medical benefits to its employees and retirees pursuant to a series of collective bargaining agreements (CBAs) and Employee Benefit Agreements (EBAs) between Pirelli and the United Rubber, Cork, Linoleum and Plastic Workers of

1. At all relevant times, the actions of Titan Wheel International or its employees were on behalf of Defendant Titan Tire. For purposes of simplicity, the Court will use the term "Titan," when referring to the acts of Titan Wheel, Titan Tire, or either company's agents.

America (the union). During the early 1990's, the medical benefit obligations began to have a negative impact on Pirelli's financial situation.

In late 1993, Pirelli decided to sell its Des Moines facility. Pirelli wanted out of the agricultural tire business. In addition, the sale of the plant would allow Pirelli to get seventy million dollars in retiree medical obligations off the books. At the time, the document governing the employee benefits was an EBA which Pirelli and the union entered into on July 15, 1991. The agreement was set to expire on July 15, 1994.

In March 1994, Maurice Taylor, the president of Titan, contacted Pirelli about the purchase of the Des Moines facility. Representatives of Titan and Pirelli met on April 25, 1994, to negotiate the terms of the acquisition. The parties discussed the retiree medical benefit liability extensively. Pirelli representatives made clear that the purchaser of the facility would have to assume the liability for the Des Moines employees. Pirelli did not inform Titan that Pirelli's investment banking firm, J.P. Morgan & Co., had valued the facility in the negative when taking account of the retiree medical liability. However, Pirelli's chief negotiator, Luciano Gobbi, told Taylor that the present value of the retiree medical liability was approximately $60 million. Gobbi's estimate assumed that the benefits would be paid for life, and this assumption was disclosed to Titan.

In May 1994, Titan, along with its outside auditor, Price Waterhouse, began performing a due diligence investigation into the purchase of the Des Moines plant assets. The central documents relating to the retiree medical liability, the 1991 EBA and the 1991 CBA, were both provided to Titan along with voluminous other documents. There was no record that Pirelli turned over certain other documents, including expired EBAs, expired CBAs, and certain documents relating to a 1990 Optional Pension Severance Program (OPS program). However, Sherwood Willard, Pirelli's General Counsel, believed that Pirelli had turned over all of the documents requested by Titan. The Court finds that Pirelli did not intentionally withhold any relevant or requested information.

Pirelli and Titan again met for negotiations in May 1994. Taylor initially proposed to purchase the facility for $20 million and assume all of its liabilities, including the retiree medical liability. This offer reflected total consideration for the plant of $87 million, with approximately $63 million allocable to the assumption of the retiree medical liability. According to Taylor, Titan intended to buy out or modify the retiree medical benefits after assuming the liability. In June 1994, however, the proposed transaction fell apart because Titan told Pirelli that it would not assume the retiree medical obligations.

The parties resumed negotiations in early July 1994. The retiree medical benefits liability remained one of the focal points of the discussion. The extent of this liability depended on the duration of the obligation to provide medical benefits. Pirelli had been exploring the possibility of terminating the retiree medical benefits. Pirelli believed that it had a good argument that certain language in the 1991 EBA entitled it to terminate the benefits at all its plants 90 days after the EBA terminated. However, both Pirelli and Titan recognized that the union would have a counter-argument that the EBA created lifetime benefits.[2] Further, both parties knew that Pirelli's termination efforts might not succeed in court. Accordingly, Pirelli continued to insist that Titan assume any retiree medical benefit liability associated with the Des Moines facility. On July 7, 1994 Pirelli notified the union by letter of its intention to terminate the benefits after the expiration of the 1991 EBA.

In a July 8 conference call, representatives of Titan and Pirelli discussed the acquisition of the Des Moines facility and the legal viability of terminating the retiree medical benefits. In addition to Maurice Taylor, Cheri

---

2. Memoranda and estimates prepared on both sides reflected an understanding that the medical benefit liability allocated to the Des Moines facility would amount to approximately $50–70 million, a figure which contemplated the continuing obligation for lifetime benefits. In addition, Willard discussed the potential ambiguity in the EBA regarding the duration of the retiree medical benefits.

Holley (Titan's general counsel), Bill McCleery (Titan's outside corporate counsel), and Doug Olson (Titan's outside labor attorney) all participated on behalf of Titan. The parties discussed the most favorable possible venue for Pirelli to file a declaratory judgment action on its termination rights. Doug Olson recommended the Eighth Circuit because that forum had a presumption against vesting of employee benefits.

Cheri Holley testified that Pirelli's attorney, Gail Sanger, stated at the phone conference that she (Sanger) had conducted a thorough investigation into Pirelli's ability to terminate the benefits. Holley and Taylor also testified that Pirelli representatives told them that Pirelli had never given lifetime benefits. This testimony was not supported by other witnesses (including some of Titan's own representatives) and the Court did not find Holley or Taylor credible. The Court finds that at no time during the phone conference (or at any other time), did Pirelli representatives state that Pirelli had conducted any factual investigation into their termination rights. Nor did Pirelli ever tell Titan representatives that it had the right to terminate the benefits. At most, Pirelli discussed the legal position it planned to take, and the most favorable venue in which to assert that position.

Both parties were aware that the duration of the medical benefits liability would turn largely on whether Pirelli had ever promised lifetime benefits to its employees. Accordingly, Titan asked Pirelli for a written representation in the Asset Purchase Agreement that Pirelli had never promised lifetime benefits. Pirelli was unwilling to make such a broad warranty. Instead, Pirelli insisted on a far more narrow representation. First, Pirelli would not make any guarantees about Pirelli's (or its predecessor's) pre–1989 conduct or statements. Second, Pirelli would make no guarantees about the conduct or representations of its lower level officers. Third, Pirelli refused to make any guarantees about any oral statements by Pirelli representatives. Titan representatives eventually accepted all of these restrictions and the following provision was adopted as section 5.20 of the final Asset Purchase Agreement:

> *Retiree Medical Obligations.* Since 1989, neither the President nor any executive officer of Seller who is, or then was an officer reporting directly to the President, has provided any letter or other formal written notification to the union representing the Transferred Employees stating that such Transferred Employees or the Retired Employees were entitled to receive lifetime retiree medical benefits.

Around the time that Pirelli notified the union of its intention to terminate benefits, it commenced a declaratory judgment action on its termination rights in the Southern District of Iowa (Eighth Circuit). Pirelli asserted its position that the benefits were terminable after the expiration of the EBA. The union had taken the position that the benefits were vested lifetime rights of the employees. Titan was informed of the litigation and of the opposing positions of Pirelli and the union.

On July 17, 1994, the parties signed the Asset Purchase Agreement. Under § 2.04, Titan agreed to assume "liability for all retiree medical benefits, fixed or contingent, now or hereafter determined for which [Pirelli] is or hereafter is found to be liable, to Des Moines Employees...." Titan immediately took control of the Des Moines plant. Closing was set to take place on August 11, 1994.

On July 18, 1994, the union filed its own action against Pirelli in the United States District Court for the Middle District of Tennessee (Sixth Circuit) seeking to enforce lifetime retiree medical benefits for all of Pirelli's union retirees. The filing was widely publicized and Maurice Taylor and Titan's lawyers found out about it shortly afterwards. On August 9, 1994, the union deposed Harold Hoppert, a former vice president of human resources for Pirelli. Pirelli had listed the Tennessee litigation and the scheduling of the August 9 deposition in a draft amended disclosure schedule which Pirelli gave to Titan at least as early as the closing on August 11, 1994.

The closing took place as scheduled on August 11, 1994.

In September, the district court in Iowa dismissed Pirelli's declaratory judgment action so that the litigation could proceed in the district court in Tennessee.

In late October, Titan notified Pirelli that Titan did not feel it had any liability for the retiree medical benefits.

Approximately two months later, the Tennessee district court ruled against Pirelli and in favor of the union on the benefits termination issue. *United Rubber, Cork, Linoleum & Plastic Workers of America v. Pirelli Armstrong Tire Corp.*, 873 F.Supp. 1093 (M.D.Tenn.1994). The court concluded that the provisions of the 1991 EBA were ambiguous as to the duration of the benefits. *Id.* at 1101. Accordingly, the court looked to extrinsic evidence and determined that the intent of the parties was to provide lifetime benefits for retirees. *Id.* The Court held that Pirelli was estopped from terminating the benefits.

Shortly thereafter, Pirelli brought this action for breach of the Asset Purchase Agreement seeking damages and equitable relief.

## DISCUSSION

Titan raises a number of affirmative defenses to Pirelli's breach of contract claim. Specifically, Titan asserts that Pirelli: (1) committed fraud; (2) committed negligent misrepresentation; (3) breached the Asset Purchase Agreement; and (4) comes to the Court with unclean hands.

### A. Fraud

 Titan claims that Pirelli fraudulently induced it to assume liability for the retiree medical benefits. Under Illinois law, fraud can invalidate a contract. *Regensburger v. China Adoption Consultants, Ltd.*, 1998 WL 117888 (7th Cir.1998). In order to establish fraud, a party must prove each of the following elements: (1) a misrepresentation of material fact; (2) that the misrepresenting party knew the statement was false; (3) that the statement was made with the intent to induce the other party to act; (4) that the acting party believed and relied on the truth of the statement; and (5) that the acting party had a right to rely on the state-

ment. *Brayton Chemicals v. First Farmers State Bank, etc.*, 671 F.2d 1047, 1050 (7th Cir.1982) (Illinois law). A party claiming fraud must prove each element by clear and convincing evidence. *Cole v. Ignatius*, 114 Ill.App.3d 66, 69 Ill.Dec. 820, 448 N.E.2d 538, 544 (1983).

 Given the Court's factual findings above, Titan's fraud argument is a nonstarter. Titan asserts that Pirelli made numerous misrepresentations during the course of negotiations and due diligence. According to Titan, Pirelli's "primary misrepresentations" were:

(a) that [Pirelli] had made full disclosure of the relevant documents and information, (b) that [Pirelli] had conducted a thorough investigation into its ability to terminate the retiree medical benefits, and © that, based upon this investigation, Pirelli had the right to terminate these benefits for retired salaried employees at any time and, for retired union employees, 90 days after the expiration of the 1991 Collective Bargaining Agreement.

The Court has already found that Pirelli never stated that it had conducted an investigation or that it had the right to terminate the benefits. Therefore, the second and third of the "primary misrepresentations" cannot form the basis of a fraud claim because Titan failed to prove they ever occurred. Titan also claims that Pirelli misrepresented that it had made "full disclosure of the relevant documents and information." Titan failed to show that Pirelli ever made such a representation. Moreover, Titan failed to prove that the representation, even if it occurred, was false. In any event, the Court finds that the nondisclosures, to the extent any occurred, were unintentional and not intended to deceive or induce reliance.

 Titan's post-trial memorandum also alleges a miscellany of specific "misrepresentations" and/or "omissions." These alleged misrepresentations include, for example: (1) Pirelli's failure to properly draw Titan's attention to certain depositions in the Tennessee litigation; (2) Pirelli's alleged mischaracterization of a "Special Medicare Part B form" as a "data sheet"; (3) Pirelli's failure to disclose the existence of the OPS program;

and (4) Pirelli's failure to properly draw Titan's attention to the existence of the Tennessee litigation before the date of closing. To the extent that such incidents are not simply illustrative of the "primary misrepresentations" discussed above, the Court finds that they also cannot form the basis of fraud. Even if these incidents amounted to misrepresentations, which the Court doubts, they were not material. Further, Titan failed to produce evidence that Pirelli ever intended to deceive Titan or induce its reliance.

■ As an alternative ground for rejecting Titan's fraud defense, the Court notes that even if Pirelli had misrepresented that it conducted an investigation and could terminate the benefits, Titan would have had no right to rely on that statement. Titan admits that it received the 1991 EBA. This agreement contained conflicting provisions on the duration of the benefit obligation. In addition, Titan knew about Pirelli's dispute with the union and about the union's position that the EBA granted lifetime benefits. Finally, Titan knew that Pirelli had taken great pains negotiating the Asset Purchase Agreement to shift the risk of any lifetime medical benefit liability to Titan. All this was more than enough information to alert Titan and Titan's team of lawyers that the assumption of liability was risky business. If Titan wanted certainty, it should have conducted its own investigation.

> A party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract. The application of this rule is particularly appropriate where the parties to the agreement are sophisticated businesspersons.

*Northern Trust Co. v. VIII South Michigan Associates,* 276 Ill.App.3d 355, 212 Ill.Dec. 750, 657 N.E.2d 1095, 1103 (1995).

## B. Negligent Misrepresentation

■ As another affirmative defense, Titan maintains that Pirelli committed the tort of negligent misrepresentation. However, a claim of negligent misrepresentation can only be made against a defendant who, in the course of the defendant's business, supplies the information to guide others in their business transactions with third parties. *Advent Electronics, Inc. v. Buckman,* 918 F.Supp. 260, 265 (N.D.Ill.1996) (Illinois law). Pirelli supplied no information in such a context. Additionally, Titan failed to prove the elements of material misrepresentation and the intent to induce action, both of which are required to establish negligent misrepresentation. *Rosenstein v. Standard & Poor's Corp.,* 264 Ill.App.3d 818, 201 Ill.Dec. 233, 636 N.E.2d 665, 667 (1993).

## C. Breach

Titan argues that Pirelli is not entitled to the relief it seeks because Pirelli breached several provisions of the Asset Purchase Agreement. Specifically, Titan contends that Pirelli breached sections 5.12, 5.20, and 13.09.

### 1. § 5.12

Titan first argues that Pirelli breached § 5.12 of the Asset Purchase Agreement. Among other things, this provision: (1) states that certain enumerated "Material Contracts" are listed in a Disclosure Schedule; (2) represents that the enumerated "Material Contracts" are valid and "in full force and effect in all material respects"; and (3) represents that Pirelli is not in breach of the enumerated "Material Contracts." Titan contends that Pirelli's failure to list certain expired EBAs, CBAs, and OPS Program documents violated § 5.12. Titan has failed to establish the affirmative defense of breach under this theory. As Pirelli points out, the expired EBAs and CBAs were not in "full force and effect" at any relevant time. As for the OPS Program documents, they do not fall within any of § 5.12's enumerated "Material Contracts." Titan does not bother to explain in its pre-trial or post-trial memoranda why these items should be considered "Material Contracts" within the meaning of § 5.12.

Titan also states that Pirelli breached § 5.12 because its representation in § 5.12 that it was not in breach of any of the "Material Contracts" was false. Titan states, without explanation, that the outcome of certain related litigation establishes that Pirelli was in breach of various EBAs and CBAs (both current and expired) and also in breach

of the OPS program. First, as this Court has already noted, Titan has not shown that the OPS Program documents, or the expired CBAs and EBAs, are "Material Contracts" within the meaning of § 5.12. Second, and contrary to Titan's conclusory allegations, the settlement or outcome of other actions (including the Tennessee litigation) does not prove that Pirelli ever breached the specified agreements.

Finally, Titan claims that Pirelli breached that portion of § 5.12 which states: "To Seller's knowledge, there are no binding oral agreements which would constitute Material Contracts." Again, without explanation or support, Titan contends: "To the extent that Judge Nixon's decision in the Tennessee litigation relied on both the CBA and oral commitments made by [Pirelli], these oral agreements constitute a further breach of § 5.12 by [Pirelli]." Titan has failed to produce evidence that any "oral commitments" constituted "Material Contracts," or if they did, that Pirelli knew about them.

In sum, Titan's allegations that Pirelli breached § 5.12 of the Asset Purchase Agreement cannot serve as an affirmative defense to its obligation to assume retiree medical benefit liability.

**2. § 5.20**

■ Titan also argues that Pirelli breached § 5.20 of the Asset Purchase Agreement. That provision reads as follows:

> *Retiree Medical Obligations.* Since 1989, neither the President nor any executive officer of Seller who is, or then was an officer reporting directly to the President, has provided any letter or other formal written notification to the union representing the Transferred Employees stating that such Transferred Employees or the Retired Employees were entitled to receive lifetime retiree medical benefits.

Titan argues that the 1991 EBA between Pirelli and the union constituted a violation of Section 5.20. Titan's theory must rest on the premise that the EBA constituted "a letter or formal written notification to the union . . . stating that [the employees] were enti-

tled to receive lifetime retiree medical benefits." This premise, Titan argues, is proved by the Tennessee decision which held that the EBA (when interpreted in light of extrinsic evidence) had the legal effect of giving lifetime benefits. Titan discounts Pirelli's argument that the parties obviously never intended § 5.20 to include the EBA within the class of documents embraced by the terms, "letter" or "formal written notification." Instead, Titan contends that the Court must focus on the "plain meaning" of the provision.

In the first place, the "plain meaning" of § 5.20 does not support Titan's argument. That provision only embraces letters and formal written "notifications," and only those notifications "stating" that employees were entitled to lifetime benefits. Titan does not point to any portion of the EBA which "states" that employees were entitled to lifetime benefits. Indeed, as both Titan and Pirelli knew throughout the negotiations, the EBA was ambiguous as to the duration of the benefits. Moreover, the Tennessee decision does not support Titan's argument; it undermines it. Judge Nixon's opinion repeatedly emphasized the EBA's ambiguity as to the duration of retiree medical benefits. *See, e.g., United Rubber,* 873 F.Supp. at 1098, 1099, 1100, 1101. Rather than relying exclusively on this ambiguous instrument, the court looked to "extrinsic evidence presented to determine the intent of the parties." *Id.* at 1100. Accordingly, the decision that the EBA entitled the employees to lifetime benefits was based on the underlying intent of the parties, rather than any "notification" or "statement" in the document itself.

■ But this focus on the "plain meaning" of § 5.20 overlooks the more obvious flaw in Titan's argument. In essence, Titan asks this Court to read § 5.20 as Pirelli's unconditional guarantee that the EBA would not have the legal effect of creating lifetime benefits.[3] And yet § 2.04, a provision Pirelli insisted upon, requires Titan to assume liability "for all retiree medical benefits, fixed or contingent, now or hereafter determined for which [Pirelli] is or hereafter is found to be liable, to Des Moines Employees." Titan's

3. Of course, Pirelli consistently refused during negotiations to make any such guarantee.

reading would require this Court to accept the following contorted reality: In one provision, Pirelli contracts to shift liability for any medical benefits "hereinafter determined" to Titan; in another provision, Pirelli guarantees Titan that no such liability would ever be determined. Such a reading would not only attribute bizarre bargaining behavior to Pirelli, it would run afoul of the principle that a contract should be read to give effect to all its provisions. *See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). In short, Titan's argument that the EBA itself violated § 5.20 comports with neither the "plain meaning" nor the obvious purpose of that provision.

Titan also argues that two other documents violated § 5.20. First, Titan points to "Letter #8," an attachment to the EBA which states that union retirees would not be asked to make contributions to the cost of their medical benefits until 1997. The letter does not state that the retirees were entitled to lifetime benefits and therefore does not violate § 5.20. Second, Titan points to a "Special Medicare Benefits Data Form B." Nowhere does the Form explicitly state the retirees are entitled to lifetime benefits. Further, the Form gives no indication that it was ever "provided" by the President or any "executive officer ... reporting directly to the President." Accordingly, the form does not violate § 5.20.

**3. § 13.09**

 Finally, Titan claims that Pirelli violated § 13.09. That provision required Pirelli to: (1) "consult" with Titan's lawyers "with respect to" the Iowa lawsuit; (2) consent to Titan's intervention in the Iowa lawsuit as to the Des Moines employees; (3) allow Titan to settle the litigation at its own expense as to the Des Moines employees with court approval and a release to Pirelli. Titan claims that Pirelli violated the first of these obligations by failing to "consult" with Titan's lawyers "with respect to" the Iowa lawsuit. Specifically, Titan complains that Titan failed to adequately draw Titan's attention to the commencement and implications of the Tennessee litigation, and that it failed to disclose the content of potentially unfavorable deposition testimony.

Titan's argument will turn on the scope of Pirelli's duty to "consult" under § 13.09. Titan essentially reads § 13.09 as imposing a one-sided full-disclosure duty on Pirelli. The Court believes the more natural reading of § 13.09 is as Pirelli's agreement to cooperate with and accommodate any effort by Titan to participate in the litigation. The Court finds that Pirelli did not breach any duty to consult under § 13.09. Titan made no effort to intervene in the Iowa litigation as was its right under § 13.09. Moreover, Titan's president and lawyers knew about the Tennessee litigation shortly after it began but still made no effort to get involved. Section 13.09 did not require Pirelli to make regular progress reports about the details of the litigation, particularly in light of Titan's failure to participate or otherwise show any interest in the litigation. At closing, Pirelli gave Titan an updated disclosure schedule listing the Tennessee litigation and the scheduling of Mr. Hoppert's deposition. If a duty to "consult" even arose under these circumstances, Pirelli more than satisfied that duty.

**D. Unclean Hands**

Titan argues that Pirelli is not entitled to the relief it seeks because Pirelli comes to court with unclean hands. *See, e.g., Monahan v. Village of Hinsdale*, 210 Ill.App.3d 985, 155 Ill.Dec. 571, 569 N.E.2d 1182, 1189 (1991). Titan's argument rests entirely on contentions that Pirelli defrauded Titan and breached the Asset Purchase Agreement, contentions this Court already found to be without merit. Accordingly, Titan's unclean hands argument cannot succeed.

**CONCLUSION**

For the foregoing reasons, the Court finds all of Titan's affirmative defenses to be without merit. Accordingly, Titan cannot escape its contractual obligation to assume the retiree medical benefit liability.

*Ergo,* judgment as to liability is hereby entered in favor of Plaintiff Pirelli Arm-

strong Tire Corporation and against Defendant Titan Tire Corporation.