17 F.3d 906
 145 L.R.R.M. (BNA) 2622, 127 Lab.Cas. P 11,036
 CINCINNATI TYPOGRAPHICAL UNION NO. 3, LOCAL 14519,
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO,
Plaintiff-Appellant,
v.
GANNETT SATELLITE INFORMATION NETWORK, INC. d/b/a Cincinnati
Enquirer, Defendant-Appellee.
 No. 92-4181.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 2, 1993.
Decided March 1, 1994.
 
 Richard Rosenblatt (argued and briefed), Englewood, CO, for plaintiff-appellant.
 Donald C. Dowling, Jr. (briefed), Thomas A. Brennan (argued and briefed), Cincinnati, OH, for defendant-appellee.
 Before: JONES and SUHRHEINRICH, Circuit Judges; and ENGEL, Senior Circuit Judge.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Cincinnati Typographical Union No. 3 ("Union") appeals the summary judgment granted to Defendant Gannett Satellite Information Network, Inc., which publishes the Cincinnati Enquirer, one of Cincinnati's two large daily newspapers. The union brought this action after the Enquirer denied arbitration in a union challenge to the layoff of several employees. Finding that the Enquirer had no obligation to arbitrate the challenge, we affirm the summary judgment.
 
 
 2
 * The union, which represents printers employed in the Enquirer's composing room, has had collective bargaining agreements ("CBAs") with the Enquirer since at least 1906. The printers set the type used to produce the newspaper, and, due to an agreement between newspapers, they also set the type used to produce the city's other large paper, the Cincinnati Post.
 
 
 3
 Since 1941, the parties have bargained for provisions creating what is referred to as "reproduction on the hook." That term refers to advertising copy that has arrived in pre-set form and been published in the Enquirer, but which printers may nevertheless spend time duplicating even though the copy they reproduce will never be published. As the legal issue before us is whether the printers' right to reproduce such copy is one that is "accrued or vested" such that it survives the expiration of a collective bargaining agreement, we must first explain exactly what that right is and how it came to be.
 
 
 4
 The function of reproduction dates from the mid-century advent of linotype machines, which for the first time made it possible for copy from one newspaper to be republished at another newspaper without the second newspaper's printers needing to re-set the type. Printers' unions originally opposed the use of this new technology, anticipating that it would result in a loss of printing jobs. To prevent such a loss, unions bargained for the right to maintain their members' jobs, even in the face of diminished need. The unions proposed terms providing for the reproduction of pre-set work, in order that employers could not lay off printers due to a lack of work where the lack was attributable to the new technology. Typically, under these terms, the union stored the pre-set advertising, which, in jargon, was then "on the hook." The printers subsequently reproduced the advertising during lulls in their work, assuring that they had as much work to do as they would have had if the newspaper did not accept pre-set copy. To complete the protection, CBAs that provided for reproduction on the hook guaranteed printers that they could not be laid off (for lack of work) so long as reproduction was on the hook.
 
 
 5
 The most recent CBA between the union and the Enquirer began on March 1, 1981, and contained a provisional expiration date of February 29, 1984. The contract was to be extended if negotiations for a new contract continued past the expiration date, until the parties agreed to terminate the agreement. The parties in fact were negotiating for a new contract throughout 1984 and beyond, and the agreement ran until terminated on October 12, 1987. At that time, the Enquirer posted new unilaterally implemented terms and conditions of employment. The Regional Director of the National Labor Relations Board has ruled that the Enquirer lawfully posted these new conditions of employment, for the parties had reached a genuine bargaining impasse.
 
 
 6
 The 1981 agreement continued to provide for the reproduction of local advertising. The agreement permitted the Enquirer to use pre-set local advertising on the condition that, for two weeks after the ads were published, union members would be permitted to spend time during lull periods duplicating the ads. However, in Section 34 of the agreement, the Enquirer was able to bargain for new limitations on reproduction not placed in the parties' prior agreements. First, the reproduction could only be performed by printers who held full-time jobs on February 28, 1982. Eighteen printers met this criteria. Second, the Enquirer would not pay these printers overtime wages for reproduction work, though the printers could delay reproduction past the two-week period if not enough of the qualified printers had time to reproduce copy. Thus, the agreement allowed only certain printers to perform reproduction and only for regular wages. The agreement also maintained an explicit guarantee that the qualified printers could not be laid off so long as reproduction work remained on the hook. The Enquirer's unilaterally imposed terms and conditions of employment include neither an "on the hook" clause nor a clause providing for arbitration of disputes, as the prior agreements did.
 
 
 7
 In December 1990, the Enquirer laid off three printers who were eligible to do reproduction work under the 1981 agreement. The union filed grievances over the layoffs of these printers, alleging that they were improperly discharged because the union maintained thousands of hours of work on the hook. In accordance with the parties' standard procedures under the agreement, a Joint Standing Board composed of two representatives of management and two representatives of the union convened to consider the grievance. The Board deadlocked, and the union demanded arbitration, which was the next procedural step under the agreement. However, the Enquirer refused to go to arbitration. In February 1991, the Enquirer fired a fourth printer, and the union filed another grievance, which the Enquirer also refused to arbitrate.
 
 
 8
 Pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, the union filed a complaint in federal district court alleging that the Enquirer breached the collective bargaining agreement by refusing to arbitrate the grievances. The union's basis for its claim is that it is seeking to enforce a right arising under the collective bargaining agreement that survived the termination of that agreement. The Enquirer, however, emphasizes that the 1987 posting of work conditions contains no on-the-hook clause and no arbitration clause. On September 30, 1992, the district court granted summary judgment for the Enquirer, and the plaintiffs appealed.
 
 
 9
 We are called on here to determine only whether the Enquirer is required to arbitrate the union's current grievances under the 1981 collective bargaining agreement. Arbitration is a preferred method of settling labor disputes. 29 U.S.C. Sec. 173(d); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Nevertheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Id. at 582, 80 S.Ct. at 1353. The dispute in this case involves the reconciliation of these two basic principles of labor law, for we must here determine whether arbitration is required in a situation where the parties disagree over whether their collective bargaining agreement requires arbitration.
 
 
 10
 Under the Labor Management Relations Act, the enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation so long as their application does not conflict with federal labor policy. Armistead v. Vernitron Corp., 944 F.2d 1287, 1293 (6th Cir.1991). When interpreting a collective bargaining agreement, we look at the specific language in the context of the entire agreement. Id. Our review of the district court's grant of summary judgment is de novo. Rector v. General Motors Corp., 963 F.2d 144, 146 (6th Cir.1992).
 
 II
 
 11
 The Enquirer contends that the unilaterally implemented terms and conditions of employment by themselves cut off any arbitration requirement. As the Enquirer would have it, the fact that the posted conditions contain no arbitration clause is enough to resolve this case in its favor, as those conditions replaced the 1981 agreement. The district court, without citing any authority, accepted this argument, holding that: "The Employer is not required to arbitrate a grievance regarding a layoff that arose out of a provision from a terminated CBA [collective bargaining agreement] when a unilateral change lawfully made in the newly-posted terms and conditions of employment did not provide for arbitration for such a layoff." J.A. at 42.
 
 
 12
 It is true that when the parties to a labor dispute reach a genuine impasse in their negotiations, an employer may unilaterally impose changes in the terms and conditions of employment, NLRB v. H & H Pretzel Co., 831 F.2d 650, 656 (6th Cir.1987), and in this case, the NLRB has ruled that the parties achieved an impasse and that the Enquirer's new conditions were lawfully posted. It is likewise undisputed that the new conditions contained neither an "on the hook" provision nor an arbitration clause, though the parties' expired agreement contained both.
 
 
 13
 Nevertheless, the Enquirer's initial argument is wrong, for the unilateral posting does not eliminate rights that the parties previously agreed would continue after their agreement expired. In their CBAs, parties may contract for rights that may be enforced after the time that the agreement itself ends. Armistead, 944 F.2d at 1294 (the "parties to a CBA may provide for rights that survive the termination of their collective bargaining agreement.") Likewise, the fact that a collective bargaining agreement has expired does not mean that arbitration can no longer occur under it. Nolde Bros., Inc. v. Bakery Workers, 430 U.S. 243, 250-52, 97 S.Ct. 1067, 1072, 51 L.Ed.2d 300 (1977). Nor is the rule in Nolde Bros. inapplicable to a situation where unilaterally posted terms and conditions have been lawfully posted. In fact, even the new terms and conditions of employment that the Enquirer posted expressly recognize the company's continuing obligation to arbitrate claims arising under the old contract.[1] See United Food & Comm. Wkrs. v. Gold Star Sausage Co., 897 F.2d 1022, 1026-27 (10th Cir.1990) (reviewing grievances under expired collective bargaining agreement instead of under unilaterally implemented posting).
 
 III
 
 14
 Given that arbitration under an expired contract could be required despite a unilateral posting, the next question to be addressed is whether it is required here. The standard in this regard has been set by the Supreme Court. The Court's Nolde Bros. decision involved a situation where an employer was required to arbitrate a dispute which arose after the termination of an agreement. In Nolde Bros., an employer discharged its employees when it closed one of its operations four days after the termination of a collective bargaining agreement. The employer settled claims for wages, but it refused to award severance pay as required by the agreement and also declined to submit the dispute to arbitration. Noting that a collective bargaining agreement may contemplate the accrual of rights during its term and the realization of rights after it expires, the Supreme Court reasoned that whether such treatment was intended for severance pay in the dispute "hinges on the interpretation ultimately given the contract clause providing for severance pay." Nolde Bros., 430 U.S. at 249, 97 S.Ct. at 1071. The Court ordered arbitration, finding that the severance pay dispute, "although arising after the expiration of the collective-bargaining contract, clearly arises under that contract." Id. In Litton Financial Printing v. NLRB, 501 U.S. 190, ----, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177 (1991), the Court characterized the test for whether a post-expiration dispute arises under the contract and must be arbitrated:
 
 
 15
 A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.
 
 
 16
 Once it is determined that a grievance arises under a contract, the policy favoring arbitration makes it "presume[d] as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." Id. 501 U.S. at ----, 111 S.Ct. at 2226.
 
 
 17
 In this case, the union argues strenuously that the "right to not be laid-off while reproduction is on the hook" is an "accrued or vested" right that arises under the 1981 collective bargaining agreement as per the second of the three situations described in Litton. Union Br. at 16-28. This right was explicit in the 1981 agreement, which stated that the full-time workers permitted to do reproduction work "may not be laid off so long as reproduction is on the hook." J.A. at 19. There are two basic ways in which the union might show us that the right is accrued or vested and thus survives the expiration of the CBA. As discussed below, we believe that neither of these pathways lead to the union's desired conclusion.
 
 
 18
 First, a court may use standard principles of contract interpretation to determine whether a right is vested. International Union, United Auto, etc. v. Yard-Man, Inc., 716 F.2d 1476, 1479-80 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Therefore, we might conclude the parties intended a right to vest if we are shown contract language or extrinsic evidence to support that conclusion. See id. (holding that life and health benefits in a particular contract were intended to be vested and thus survived the expiration of the contract); Bidlack v. Wheelabrator Corp., 993 F.2d 603, 611-13 (7th Cir.1993) (en banc) (opinion of Cudahy, J.) (describing various approaches to using language and extrinsic evidence to determine whether a right was intended to vest and citing International Union favorably), cert. denied, --- U.S. ----, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993).
 
 
 19
 The union does not persuade us through text or extrinsic evidence that the right at issue here was intended to vest. The CBA includes no language that would indicate as much, and the union tries to show vesting mainly through reliance upon the history of the "reproduction on the hook" right. While that history shows us why the parties ended up bargaining for the right, and why the right remained in the CBA throughout the years, it does not provide us with evidence of the intended duration of the right with regard to particular employees. Indeed, the fact that in the 1981 agreement the parties limited the protection from layoffs while reproduction was on the hook to only a few printers tends to indicate that the parties have viewed the right as a creature of a particular contract and not as a right vested and thus guaranteed for the future.
 
 
 20
 There are, secondly, certain types of rights that courts presume to be "accrued or vested" without any other evidence in a contract. These are rights that can be worked toward or accumulated over time. Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T., Inc., 795 F.2d 1400, 1404 (8th Cir.) (en banc), cert. denied, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986). Severance pay is usually a right that accrues and vests over time, as per Nolde Bros., for the longer a person works, the more pay accrues. Vacation pay similarly is a right accruing and vesting under most agreements. In contrast, other rights are strictly "creature[s] of the collective bargaining agreement and [their] life as a matter of contract does not extend beyond contract expiration." C.R.S.T., 795 F.2d at 1404. In Litton, the Court found that protection from dismissals based on unequal aptitude or ability are not accrued or vested under a collective bargaining agreement. The Court stated:
 
 
 21
 The important point is that factors such as aptitude and ability do not remain constant, but change over time. They cannot be said to vest or accrue or be understood as a form of deferred compensation. Specific aptitudes and abilities can either improve or atrophy. And the importance of any particular skill in this equation varies with the requirements of the employer's business at any given time.
 
 
 22
 Litton, 501 U.S. at ----, 111 S.Ct. at 2227.[2] Accordingly, this circuit has held that the right to be discharged only for just cause did not survive the expiration of a collective bargaining agreement. International Bhd. of Teamsters v. Pepsi-Cola, 958 F.2d 1331 (6th Cir.1992). The nature of the right at issue here is not one that we presume to be vested. Employees do not accrue it step-by-step as they work for the employer, like the severance pay in Nolde Bros. Rather, the right is a bargained-for worker protection, like the rights not to be discharged that were at issue in Litton and Pepsi-Cola.
 
 
 23
 For the reasons stated above, we AFFIRM the district court's grant of summary judgment.
 
 
 
 [1]
 "[T]he Enquirer is, under the present state of the law, only obligated to arbitrate grievances which 'arise under' the old contract. This rule will continue to be followed unless the law is changed." J.A. at 56 (section 5(f) of company's unilateral posting of terms and conditions of employment)
 
 
 [2]
 Whether a right is properly categorized as one that is worked for over time or one that is a simple bargained-for provision presents a difficult question in the context of seniority provisions protecting longer-term workers from layoff, for they are arguably a special form of deferred compensation for work and arguably just a straight contractual benefit. See Litton, 501 U.S. at ----, 111 S.Ct. at 2227 (leaving question of seniority privileges open)