RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0091P (6th Cir.)
File Name: 02a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

<table>
<tr><td>

00-1613

DETROIT TYPOGRAPHICAL
UNION, LOCAL 18,
     *Plaintiff-Appellee,*


*v.*


DETROIT NEWSPAPER
AGENCY,
     *Defendant-Appellant.*


00-2080

DETROIT NEWSPAPER
AGENCY,
     *Plaintiff-Appellant,*


*v.*


DETROIT TYPOGRAPHICAL
UNION, LOCAL 18,
     *Defendant-Appellee.*

</td><td>

Nos. 00-1613/2080

</td></tr>
</table>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-74551; 00-70580—Julian A. Cook, Jr.,
District Judge.

1

Argued:  January 23, 2002

Decided and Filed:  March 14, 2002

Before:  KENNEDY and DAUGHTREY, Circuit Judges;
BELL, Chief District Judge.[*]

———————————

**COUNSEL**

**ARGUED:**  Robert M. Vercruysse, VERCRUYSSE, METZ & MURRAY, Bingham Farms, Michigan, for Appellant. Samuel C. McKnight, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, for Appellee.  **ON BRIEF:**  Robert M. Vercruysse, David B. Calzone, Gary S. Fealk, VERCRUYSSE, METZ & MURRAY, Bingham Farms, Michigan, John A. Taylor, Detroit, Michigan, for Appellant.  Samuel C. McKnight, David R. Radtke, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, for Appellee.

———————————

**OPINION**

———————————

KENNEDY, Circuit Judge.   The Detroit Newspaper Agency ("DNA"), which conducts joint operations for the *Detroit Free Press* and *Detroit News* newspapers, appeals two judgments of the District Court in these related cases arising in the aftermath of a strike against the newspapers by the Detroit Typographical Union, Local 18 (the "Union").  The Union sued DNA (No. 00-1613) after the strike had ended to compel arbitration of the DNA's refusal to reinstate Gary Rusnell, who had a lifetime guarantee under a collective

———

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

bargaining agreement. The DNA appeals the district court's judgment compelling the DNA to arbitrate its refusal to reinstate Rusnell. Following the arbitrator's decision to reinstate Rusnell, the DNA sued the Union (No. 00-2080) to vacate the arbitrator's decision. The DNA appeals the district court's judgment denying its motion for summary judgment and granting the Union's cross-motion for summary judgment to enforce the arbitration award. Because these two cases concern common issues, we treat them in a single opinion.

We find that Rusnell's lifetime employment guarantee was a vested right that survived the expiration of the collective bargaining agreement. While suspended during the strike, this right could not be terminated by the DNA except in accordance with the provisions of the lifetime guarantee agreement, including the arbitration provision of the last collective bargaining agreement. Therefore, we affirm the district court's judgment requiring arbitration of the dispute. We reject the DNA's objections to the arbitration award and affirm the judgement enforcing the award.

## I. FACTS

In 1974, the Union entered into separate but identical Memoranda of Agreement ("MOA") with the Detroit Free Press and the Detroit News. The DNA, the entity formed to assume the joint operational responsibilities of the two papers, adopted both MOAs. Each MOA contained a lifetime job guarantee for certain named Union members. Rusnell is one of those named as having a lifetime guarantee. The MOA states:

This guarantee shall be interrupted for the following reasons, for the duration of the incident, and restored at its conclusion:

(1) Strike or lockout.
(2) Disability of the guarantee holder.

(3) Suspension of work opportunities through an Act of God which prevents composing room employees from working.
(4) Leave of absence of the priority holder.
(5) Time off for union business.
(6) Service in the armed forces.

This guarantee shall be terminated for the following causes:

(1) Resignation of the guarantee holder.
(2) Death of the guarantee holder.
(3) Just cause separation of the guarantee holder, unless restored to his position through the appeal provision of the labor contract.
(4) Attainment of sixty-fifth (65th) birthday by the guarantee holder.
(5) Permanent suspension of publication.

The MOA also includes a section titled "MEMORANDUM TO SUPERSEDE AND EXTEND BEYOND LABOR AGREEMENT" which provides that the provisions of the MOA "shall be ongoing and part of all future collective bargaining agreements and shall not be subject to amendment except by mutual consent of the parties."

The DNA and the Union entered a series of collective bargaining agreements ("CBA") incorporating the MOA. The agreement to govern their relationship between 1992 and 1995 provided that an arbitrator would decide "all disputes regarding the interpretation of any portion of [the] agreement." The 1992-1995 CBA also included a specific provision on job guarantees which stated that the guarantees "will terminate on the occurrence" of "any one of the following": death, retirement, voluntary separation, or discharge for cause. The CBA further stated that the "guarantee commitment shall endure beyond the term of any specific Collective Bargaining Agreement executed between the parties."

purely monetary relief in view of the nature of the dispute. The Court's order that the parties arbitrate would mean nothing if a subsequent court could not enforce the decision of the arbitrator. Employers and employees bargain for arbitrability clauses--and either party is free to insist on language limiting the possible remedies available to an arbitrator. But when the arbitrator has ordered reinstatement, the district court's enforcement of such an award merely carries out the parties' intention to resolve the dispute through the vehicle of arbitration. Thus, such enforcement does not run afoul of Norris-LaGuardia.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court ordering arbitration and its judgment enforcing the arbitrator's award.

law, affirmed the district court's finding that the employees' rights remained enforceable after the expiration of the collective bargaining agreement.

The issue of Norris-LaGuardia arose because of plaintiffs' claim that if mitigation of their damages was required, they should be entitled alternatively to specific performance, although they had not sought that remedy. In holding that Norris-LaGuardia would preclude specific performance, the Court explained:

The result [of accommodating and reconciling older statutes with newer ones] has been the creation of narrow exceptions to the broad anti-injunction provisions of the Norris-LaGuardia Act, principally the grant of specific performance against management of grievance arbitration clauses, and against unions of no-strike provisions, the quid pro quo of arbitration clauses.

*Heheman,* 661 F.2d at 1124 (citations omitted).

The *Heheman* Court noted that one of important exceptions from this general prohibition on injunctive relief carved out by the precedents was for matters pertaining to "the enforcement of the arbitration provisions of . . . contracts." *See id.* (citing *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 409 (1976)).

In upholding the district court's confirmation of the arbitration *award* we are enforcing the arbitration provision of the contract, and not, as in *Heheman,* enforcing an employment contract. We are enforcing the dispute resolution mechanism to which the parties agreed. To do otherwise would render meaningless and unenforceable arbitration provisions that contemplate an award of specific performance. In the dispute in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448 (1957), the Supreme Court enforced an arbitration clause in regard to a dispute concerning "work loads and work assignments." *Id.* at 449. The grievance at issue in *Lincoln Mills* clearly did not seek

On April 30, 1995, the CBA between the parties expired, and on July 30, the Union and other unions whose members were employed by the DNA went on strike. During the strike, in response to violence on the part of members of some of the other striking unions, the DNA filed an unfair labor practice charge against all of the striking unions, including the Typographical Union. As part of a consent order which applied to the Union, the National Labor Relations Board ("NLRB") called on the strikers to cease and desist "blocking or otherwise coercively interfering with ingress or egress" to DNA facilities "in any manner or by any means including, but not limited to: physical confrontation or intimidation, unlawful group trespass, mass picketing, stationary picketing, or placement of barriers, or star nails or other sharp object." No. 00-2080 App. at 167. The Sixth Circuit subsequently enforced the NLRB's order.

Rusnell participated in a demonstration during the strike in which strikers sat down in front of the Detroit offices of the *Detroit News*. The DNA subsequently sent a letter to Rusnell which stated:

You are being discharged from the Detroit Newspaper Agency because of your conduct on August 30, 1996.
On that date you blocked the ingress and egress to the front entrance of The Detroit News building. Your conduct is even more egregious in that it violates a formal National Labor Relations Board Settlement Agreement prohibiting such behavior.
This type of behavior will not be tolerated and is just and sufficient cause for your discharge.

In February, 1997, the Union made an unconditional offer to return to work, and the DNA began re-hiring lifetime guarantee holders other than those who had turned 65 during the course of the strike and those it had terminated for alleged strike misconduct. Rusnell was among the employees the DNA refused to reinstate.

In March, 1997, the Union filed a grievance complaining about DNA's failure to re-hire Rusnell (and other employees whose cases have since settled). The DNA refused to arbitrate the issues of whether Rusnell had rights under the MOA that survived the expiration of the collective bargaining agreement, whether those rights should be arbitrated, and whether it had "just cause" to terminate Rusnell. The Union brought suit in district court to compel arbitration. The DNA argued that arbitration was not available as to the lifetime job guarantees because the guarantees were interrupted by the strike and thus (during the course of the strike) could be terminated at DNA's discretion. The DNA also argued that in any event arbitration was not available because the collective bargaining agreement had expired before Rusnell's discharge.

On March 3, 1998, the district court granted the Union's motion for summary judgment to compel arbitration. The court recounted the standard for compelling arbitration, noting that it could not decline to order arbitration unless it could say with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." The court found that a "strong argument" could be made that the job guarantee provisions survived the "mere expiration of any agreement." The court found unpersuasive the DNA's argument that Rusnell's termination was not subject to arbitration because the job guarantees did not apply during the strike. The court noted that the DNA's position presumed that the merits of the dispute--whether the guarantees applied during the strike--would be decided in its favor. Since the court was apparently convinced that the Union's position on whether the guarantees were in force during the strike was at least arguable, it ordered arbitration. In a later order, the court characterized its March 3 decision as determining "that the parties had contracted to submit the subject matter of the grievance to arbitration."

The case thus proceeded to arbitration. The DNA again disputed whether the DNA was required to arbitrate Rusnell's

industrial justice, but was rather reaching a sensible conclusion about the meaning of the MOA.

As to the DNA's argument that the arbitrator wrongly ignored the NLRB and Sixth Circuit orders prohibiting the Union from blocking entrances to the DNA's facilities, we agree with the district court that, even if this were error, it was harmless error and thus does not provide a basis for rejecting the arbitrator's award. The arbitrator made a factual finding that "Mr. Rusnell plainly did not, by himself, hinder any person's, or any potential person's, ingress to or egress from the building." There is no basis for believing that, in making this factual finding, the arbitrator exercised his own brand of industrial justice, and given those facts, it would be difficult to find that just cause existed to terminate Rusnell.

Finally, the DNA argues that the district court erred by not accepting its argument (made for the first time in its motion for reconsideration of the court's refusal to overturn the arbitrator's award) that confirming the arbitration award would violate the Norris-LaGuardia Act,[1] which forbids a court from granting injunctive relief in a labor dispute. The DNA relies on our decision in *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1124 (6th Cir. 1981), where we held that the Norris-LaGuardia Act would prevent the district court from ordering the E.W. Scripps Company to specifically perform a lifetime contract with members of the Typographical Union for the *Cincinnati Post* who lost their jobs when the Post merged with the *Cincinnati Enquirer* and the *Post*'s composing room was closed, leaving no work for typographers or printers at the *Post*. The affected *Post* employees sued for damages for breach of their lifetime employment agreement. The court, applying federal labor

---

[1] The relevant provision states: "No court of the Untied States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person . . . from . . . (a) Ceasing or refusing to perform any work or to remain in any relation of employment." 29 U.S.C. § 104.

*United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38 (1987). We do not hesitate to review arbitrator's decisions when they "depart[ ] from any conceivable interpretation of the contract." *Beacon Journal Pub. Co. v. Akron Newspaper Guild*, 114 F.3d 596, 600 (6th Cir. 1997). But as long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not the arbitrator's "own brand of industrial justice," it must be enforced. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

Applying this exceptionally narrow standard, "one of the narrowest standards of judicial review in all of American Jurisprudence," *Lattimer-Stevens Co. v. United Steelworkers*, 913 F.2d 1166, 1169 (6th Cir. 1990), we find no basis for overturning the arbitrator's decision and thus affirm the ruling of the district court. The arbitrator applied accepted principles of contractual interpretation in concluding that a guarantee holder could not be terminated without just cause even during a strike, interpreting the agreement so that every provision had meaning. The circumstantial evidence provided by DNA's own termination letter (in which it said it was terminating Rusnell for just cause) and statement in arbitration (that just cause was the only issue to be arbitrated) provide support for the arbitrator's conclusion that the parties did not intend to permit unilateral discretionary termination of guarantee holders during strikes and lock-outs. The arbitrator also looked to another arbitration award under a similar provision in a contract between the DNA and a different union that reached the same conclusion--a lifetime guarantee holder cannot be terminated without cause, even during a strike. Ultimately, even if the DNA's interpretation of the contract is correct (we think that it is not), the DNA still has not sufficiently demonstrated that the arbitrator's interpretation did not draw its "essence" from the agreement so as to justify overturning the award. That two arbitrators considering similar provisions for different unions' agreements reached the same conclusion suggests that the arbitrator in *this* case was not dispensing "his own" brand of

termination. Arbitrator Robert A. McCormick ruled that the grievance was arbitrable. He found that "the DNA considered itself bound by the just cause provision of the lifetime job guarantee agreement when it discharged Mr. Rusnell," pointing to the DNA's discharge letter to Rusnell (which stated that it had just cause to terminate him) and to the fact that a DNA lawyer had answered "that's correct" when asked if just cause was the only issue in the arbitration.

Furthermore, Arbitrator McCormick found that the agreement itself did not permit the DNA to terminate guarantee holders during a strike, since such a reading would render frivolous the "termination" exceptions stated in the MOA. McCormick also found that the DNA lacked just cause for terminating Rusnell, since Rusnell by himself had not blocked anyone's ingress or egress to the building, promptly obeyed directions of Detroit police officers, and was not arrested. The arbitrator refused to consider whether Rusnell violated the Sixth Circuit and NLRB orders regarding blocking egress from the buildings, which he found were "beyond the scope of the arbitrator's authority which grows out of, and is limited to, the contract between the Parties."

The DNA subsequently filed suit in the district court to overturn the arbitrator's award. The DNA argued that it had not waived the issue of arbitrability, and that the arbitrator had improperly refused to consider the Sixth Circuit and NLRB orders in determining whether the DNA had "just cause" to terminate Rusnell. The Union counterclaimed for enforcement of the arbitration award.

The district court enforced the arbitrator's award. The court ruled that the arbitrator had "employed permissible tools of contractual interpretation" to conclude that a strike did not permit unilateral termination of a lifetime guarantee. The court read the guarantee as "a compromise position under which the [DNA] is protected from paying labor costs for guaranteed workers who strike while the strikers have the assurance that, absent just cause or other specified reason,

they can return to their guarantees upon their return to work." The court found that the DNA's claim regarding the NLRB/Sixth Circuit orders was a "reasonable claim of error," but that it was harmless since "the Newspaper would be unable to obtain a different outcome even if the alleged error is corrected." The court held that even if the arbitrator had considered the consent order of the NLRB and the Sixth Circuit's enforcement, he would not have found that Rusnell "obstruct[ed] or interfere[d] with the Newspaper's entryway. As such, it cannot be legitimately argued that he violated the terms of the consent orders."

The DNA subsequently filed a motion for reconsideration. For the first time, the DNA asserted that the district court lacked authority to order specific performance of the arbitration award enforcing the MOA because the Norris-LaGuardia Act bars injunctions requiring parties to specifically perform an employment guarantee. The district court ruled that Norris-LaGuardia did not prohibit it from enforcing the specific performance component of the arbitrator's award. The court noted that precedent justified enforcing the reinstatement components of arbitration awards and that other courts had explicitly excepted arbitration awards from Norris-LaGuardia's bar on ordering specific performance.

## II.  ANALYSIS

### A.  ARBITRABILITY

In the first appeal (No. 00-1613), the DNA charges the district court erred by requiring the parties to arbitrate Rusnell's grievance. The DNA's basic argument before the district court, and here, is that the strike "interrupted" the lifetime guarantees, and thus that there was no requirement during the interruption that the termination be for just cause or covered by one of the other termination provisions of the MOA. As a result, DNA asserts, the Union's request to

benefit which continues after the agreement's expiration. "[I]f a dispute arises under the contract here in question, it is subject to arbitration even in the postcontract period." *Litton*, 501 U.S. at 205.

In a case over wage cuts in the face of a virtually identical lifetime job guarantee (with the same succession clause), the Fourth Circuit compelled arbitration even after the expiration of the agreement. *See Cumberland Typographical,* 943 F.2d 401 (4th Cir. 1991). The court held that the lifetime guarantee "continue[d] after the expiration of the main collective bargaining agreement," *id.* at 405, and thus provided a basis for ordering arbitration. The Seventh Circuit has reached a similar conclusion. *See Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers Ass'n*, 853 F.2d 506, 510 (7th Cir. 1988). The DNA's efforts to distinguish the decisions from other circuits relied upon by the Union are unpersuasive. The DNA asserts that the right to a lifetime guarantee never existed for striking workers, and therefore that the right never "vested" so as to survive expiration. Since we hold that the lifetime guarantee could not be unilaterally terminated during a strike, we reject this argument. The right had fully vested, and therefore the dispute concerned interpretation of the 1992-1995 CBA in which the MOA was incorporated and thus should be resolved according to the arbitration provision of that agreement.

### B.  ENFORCEMENT OF AWARD

The DNA also appeals the district court's decision to grant summary judgment to the Union after the DNA sued to vacate the arbitrator's ruling. We review summary judgment upholding an arbitrator's ruling *de novo*, *see International Ass'n of Machinists v. Tennessee Valley Authority*, 155 F.3d 767, 771 (6th Cir. 1998), but apply the same standard as the district court. "[A]s long as the arbitrator is even arguably construing or applying the contract and is acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."

good faith to provide an hourly wage that will be reasonable under all pertinent circumstances.

*Cumberland Typographical Union No. 244 v. The Times Alleganian Co.*, 943 F.2d 401, 406-407 (4th Cir. 1991) (citation omitted).

Arbitration as a means of resolving disputes is more appropriate in this context than the traditional model of negotiation and economic bargaining, since part of labor's motivation for making concessions in order to obtain such guarantees was the recognition that technological changes had reduced labor's power at the bargaining table. *Id.* at 407.

Because we find that the guarantee could not be terminated by the unilateral discretionary action of the employer during the strike, unless that action met the termination requirements of the MOA, we turn to the whether the guarantees survived the expiration of the 1992-1995 collective bargaining agreement. In *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), the Supreme Court ruled that the right to arbitrate vested benefits survives the expiration of particular collective bargaining agreements: "[I]f a collective bargaining agreement provides in explicit terms that certain benefits continue after the agreement's expiration, disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provisions." *Id.* at 207-208. Section 11 of the MOA between the Union and DNA clearly provides that the MOA's provisions would remain "ongoing" even after the expiration of a particular collective bargaining agreement. The guarantees become part of future CBAs. Moreover, the 1992-1995 CBA stated explicitly in its incorporation of the guarantee that the guarantee would survive the expiration of the agreement. The Lifetime Guarantee MOA itself specifies that challenges to whether a separation was based on "just cause" would be resolved "through the appeals provision of the labor contract," which, in the case of the 1992-1995 CBA, was arbitration. Clearly, under *Litton*, the guarantee is a

arbitrate whether there was "just cause" for the dismissal could not be granted.

On appeal, the DNA claims that the district court declined to rule definitively on arbitrability, and argues that this was an error. The DNA also reiterates its argument that the lifetime guarantees were not arbitrable because the collective bargaining agreement had expired. The Union counters that the DNA waived its right to challenge arbitrability by arguing the issue in front of the arbitrator.

We review summary judgments compelling arbitration under a *de novo* standard. *Cincinnati Typographical Union v. Gannett Satellite Information Network, Inc.*, 17 F.3d 906, 909 (6th Cir. 1994). The Union argues that our standard for overturning arbitration awards--a much stricter one--should also apply to our review of the district court's judgment compelling arbitration. The Union does not provide any analysis or precedent to support its claim, and we think that the language of *Cincinnati Typographical Union* is quite clear on this point. Therefore, we review the district court's decision on arbitrability *de novo*.

The Union argues that the DNA waived its right to appeal arbitrability by arguing the issue of arbitrability without reservation before the Arbitrator. However, the DNA argued before the district court that the dispute was not arbitrable; therefore, it has properly preserved the issue of arbitrability in its appeal from summary judgment ordering arbitration. The case relied upon by the Union, *Vic Wertz Distributing Co. v. Teamsters Local 1038*, 898 F.2d 1136 (6th Cir. 1998), expressly distinguished itself from cases in which the issue of arbitrability is contested in the district court in an action to compel arbitration. *Id.* at 1140. Nor do we find merit in the Union's argument that the DNA's failure to take an interlocutory appeal of the district court's order to arbitrate somehow indicates it waived its right to appeal the order in a timely fashion. Similarly, the Union's reliance on the arbitration record (in which the DNA apparently limited the

issues before the arbitrator to substantive ones) is inappropriate because those facts were not part of the record before the district court when it compelled arbitration. The DNA has clearly not waived its right to appeal summary judgment as to arbitrability.

Therefore, we turn to the question of the whether the district court committed reversible error when it ordered arbitration. The DNA contends that the district court erred by "refus[ing] to resolve . . . whether there was a right to arbitrate the propriety of discharges that occurred during the strike." No. 00-1613 Br. 24. Actually, the district court explicitly determined that the dispute was "covered" by the arbitration agreement and thus compelled arbitration. No. 00-1613 App. at 510. The district court thus fulfilled its obligations under *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 651 (1986) ("It is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances . . . .").

Federal labor policy strongly favors arbitration, and "[a]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Johnston Boiler Co. v. Local Lodge No. 893, International Brotherhood of Boilermakers*, 753 F.2d 40, 43 (6th Cir. 1985) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). The district court compelled arbitration because it could not say "with positive assurance" that the dispute was not subject to arbitration. This finding, as the district court noted, would not be inconsistent with an arbitrator subsequently deciding that under the "merits and the specific facts of the particular grievance, it is not subject to arbitration."

As discussed in more detail below, we think that the Union's interpretation of the agreement is not simply one to which the agreement is susceptible, but is actually the only

fair reading of the guarantee. As the arbitrator pointed out, the guarantee includes a list of circumstances in which the guarantees are "interrupted" and a list in which they are "terminated." If an interruption permits the company to terminate guarantees without just cause, then the "termination" list is in some sense redundant. Since ordinary principles of contract interpretation call for interpreting an agreement so as to give meaning to every stated provision, interruption cannot provide the basis for termination. We think the parties intended "interruption" merely to provide a respite for the employer from paying wages and providing benefits to guarantee holders during one of the circumstances listed, in which the guarantee holder would be unable to contribute to the workplace in any real sense. The DNA has provided no authority for the proposition that the interruption of a guarantee permits an employer to terminate a guarantee holder without just cause or one of the other listed grounds for termination. Were we to accept the DNA's argument, it would mean that the employer could terminate the MOA as to employees on disability leave, in the armed services, absent on union business, or during periods in which newspaper production was suspended because of an Act of God. The unreasonableness of that conclusion is apparent.

As the Fourth Circuit has pointed out, arbitration makes particular sense in the context of lifetime employment guarantees. As that court explained:

> [L]ifetime job guarantees . . . owe their existence to the recognition, both by the relevant unions and the employers in the printing industry, that technological advances in that industry are gradually bringing about the demise of the bargaining unit and its bargaining power. Knowing that they would eventually lose the economic ability to enforce contract demands, the unions in negotiating these provisions traded opposition to management's availing itself of new technology for a guarantee of job security with an implicit covenant of