NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0051n.06

Case No. 25-1440

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BAKERY, CONFECTIONARY, TOBACCO )
WORKERS and GRAIN MILLERS )
INTERNATIONAL UNION AFL-CIO-CLC, )
LOCAL NO. 70, )
　　　　　 )
　　　　Plaintiff - Appellee, )
　　　　　 )
v. )
　　　　　 )
KELLANOVA, formerly known as Kellogg )
Company, )
　　　　　 )
　　　　Defendant - Appellant. )
　　　　　 )

**FILED**
Jan 26, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

OPINION

Before: BATCHELDER, CLAY, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Kellanova, formerly known as Kellogg Company, operates a bakery in Grand Rapids, Michigan. The bakery's hourly workers are represented by Bakery, Confectionary, Tobacco Workers and Grain Millers International Union AFL-CIO-CLC Local No. 70 (the "Union"). The Union seeks to compel Kellanova to arbitrate two employee grievances the Union claims arose under an expired collective bargaining agreement. The district court agreed with the Union and ordered the parties to arbitration. We reverse.

**BACKGROUND**

I.　　**Facts**

The parties agree on the relevant facts. Kellanova and the Union have entered into several collective bargaining agreements (CBAs), all of which require the parties to arbitrate unresolved grievances. The first CBA (the "2017 CBA") was initially effective from May 1, 2017, to April

30, 2020. In April 2020, the parties agreed to extend the 2017 CBA until 11:59 p.m. on April 30, 2021.

On August 12, 2021, the parties "agreed to the terms and conditions of a new Collective Bargaining Agreement,"—the "2021 CBA"—which was made retroactively effective from May 1, 2021, through April 30, 2023. RE 26-2, 2021 CBA, PageID 272; *see* RE 26, Corr. Stip. of Undisputed Facts, PageID 239. The "2021 CBA incorporated the terms and conditions of the expired [2017] CBA except that the terms and conditions of the 2021 CBA superseded the terms and conditions of the expired [2017] CBA." RE 26, Corr. Stip. of Undisputed Facts, PageID 239; *see also* RE 26-2, 2021 CBA, PageID 272. After the 2021 CBA expired, the parties entered into a third CBA effective May 1, 2023, through April 30, 2027 (the "2023 CBA").

According to Kellanova's labor relations attorney, "each new collective bargaining [agreement was] negotiated as its own, new, independent agreement with different terms." RE 39-2, Decl. of Pamela DiStefano, PageID 542. Even so, each CBA included nearly identical arbitration clauses requiring the parties to arbitrate any grievance not resolved within thirty days after submission of the written grievance. *See, e.g.*, RE 26-1, 2017 CBA, PageID 264; RE 26-2, 2021 CBA, PageID 300; RE 26-5, 2023 CBA, PageID 346.

The parties' dispute in this case focuses on whether grievances regarding Kellanova's transitional employees must be arbitrated. The 2017 CBA defined a transitional employee as "one that may, through the process set forth in [the agreement], transition to the Regular Full Time Upgraded Employee designation." RE 26-1, 2017 CBA, PageID 247. Kellanova relied on a "core number" plan to drive its use of transitional employees. *Id.* The "core number" was "the total full time employee population at any given time," as identified by Kellanova "[u]pon the effective date of the [2017 CBA] and annually thereafter[.]" *Id.* The 2017 CBA allowed Kellanova to "hire

transitional employees up to 25% of the Core Number established[.]" *Id.* Under the core numbers provision, if the plant employed more than the agreed-upon percentage of transitional employees, the most senior of those employees would transition to regular full-time employment until the contractual balance was achieved. *See id.*

Importantly, this transitional-employee mechanism ended with the 2017 CBA. The 2021 CBA did not require Kellanova to maintain a core number of employees. Nor did it refer to "transitional employees" or "regular full-time employees."[1] RE 26-2, 2021 CBA, PageID 276. Instead, the 2021 CBA referred to "[e]mployees hired before February 1, 2018," "[s]killed [t]rades [e]mployees ([j]ourneymen) [h]ired on or [a]fter February 1, 2018," and "[e]mployees [h]ired on or after February 1, 2018." *Id.* Kellanova used these categories to determine benefits for each group of employees. By ratifying the 2021 CBA, the Union agreed that these changes superseded the terms of the 2017 CBA.

Shortly after agreeing to the terms of the 2021 CBA, the Union filed two grievances claiming that Kellanova failed to elevate transitional employees to full-time status to achieve the required contractual balance. Grievance 219, concerning events on August 2, 2021, was filed on August 12, and Grievance 233, concerning events on August 1, 2021, was filed on August 17. Although both grievances referred at least implicitly to the 2017 CBA, the events giving rise to the grievances occurred after the 2017 CBA expired and after the 2021 CBA did away with the core numbers mechanism. Kellanova reviewed both grievances and determined that "[p]er [Kellanova's] core number calculation, [n]o transitional employees were eligible to move to Full Time status." RE 26-3, Grievance 219, PageID 314; RE 26-4, Grievance 233, PageID 316.

---

[1] Nor does the 2023 CBA refer to "transitional employees" or "regular full-time employees."

## II.      Procedural history

In January 2024, the Union sought to arbitrate the grievances. Kellanova refused to arbitrate, and, in May 2024, the Union filed a complaint to compel arbitration pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. §185. The parties filed cross motions for summary judgment. The Union argued that because "there was no expiration of the arbitration agreement or gap in CBAs," RE 40, Pl.'s Resp. to Def.'s Mot. Summ. J., PageID 549, the "unresolved grievances [fell] within the substantive scope of the parties' arbitration agreement," RE 32, Pl.'s Mem. in Supp. of Mot. Summ. J., PageID 459.

The district court granted the Union's motion for summary judgment and denied Kellanova's. The court agreed with the Union that the parties had operated "under an uninterrupted CBA obligation to arbitrate unresolved grievances from at least May 1, 2017, to the present" and reasoned that the presumption of arbitrability "weigh[ed] heavily in favor" of arbitrating the dispute. RE 45, Op. and Order, PageID 587. Although the court agreed with Kellanova that *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), governed because the parties' dispute arose after the 2017 CBA expired, the court held that *Litton* did not excuse the parties from arbitration because the dispute "ar[o]se under the terms of one or more of the CBAs[.]" RE 45, Op. and Order, PageID 588-89. Specifically, the court concluded that because the last identification of the core number, which was based on "forward-looking projections for the next twelve months," would not happen until the day after expiration of the 2017 CBA, the "terms of the CBA here necessarily anticipate survival of this issue for at least some time following expiration[.]" *Id.* at 589. The court also determined that the refusal to elevate "transitional employees who earned seniority and the right to elevate their status under the [2017 CBA] . . .

necessarily deprive[d] them of an accrued and vested benefit." *Id.* For these reasons, the district court ordered the parties to proceed with arbitration.

Kellanova appeals. We review the district court's grant of summary judgment de novo. *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007). We also review the district court's decision to compel arbitration de novo. *Id.*

## ANALYSIS

This case asks whether the Union may force Kellanova into arbitration based on an alleged violation of the expired 2017 CBA. Because the alleged violation, as detailed in the Union's grievances, did not arise under the expired 2017 CBA, we decline to compel arbitration.

Arbitration "is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (Sotomayor, J., concurring) (citation modified). Whether a collective bargaining agreement requires the parties to arbitrate a specific grievance is for the court to decide, and although we are "not to rule on the potential merits of the underlying claims," *AT & T Tech., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 649 (1986), we cannot avoid our duty simply "because it requires us to interpret a provision of a bargaining agreement," *Litton*, 501 U.S. at 209.

"Where a contract contains an arbitration clause, there is a presumption of arbitrability," and "an order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Tech.*, 475 U.S. at 650 (citation modified). This is especially true when an agreement includes a broad arbitration clause. *Id.* And "[d]oubts should be resolved in favor of coverage." *Id.*

But the presumption does not apply "wholesale in the context of an expired bargaining agreement[.]" *Litton*, 501 U.S. at 209. Instead, "a presumption in favor of postexpiration arbitration" applies only "where a dispute has its real source in the [expired] contract." *Id.* at 204-05. Under *Litton*, a grievance may arise under an expired agreement, and thus receive the presumption of arbitrability, where (1) "it involves facts and occurrences that arose before expiration"; (2) "an action taken after expiration infringes a right that accrued or vested under the agreement"; or (3) "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.* at 205-06. If the court determines, pursuant to one of these three *Litton* exceptions, that a grievance arose under the expired agreement, the next step is determining whether "the parties negated, either expressly or by clear implication, the presumption that the arbitration clause of the collective bargaining agreement extends beyond the expiration of the Old Agreement." *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local Union 2359*, 186 F.3d 733, 741 (6th Cir. 1999) (applying *Nolde Bros. v. Loc. No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 255 (1977)).

Here, it is undisputed that the parties agreed through multiple CBAs to arbitrate unresolved grievances. It is likewise undisputed that there was no gap in coverage between the CBAs. That said, each CBA stood on its own. After all, the agreement that seems to be the basis of the Union's grievances at issue here—the 2017 CBA—had fully expired when the grievances were filed, and the parties stipulated that the 2021 CBA was a "new" agreement. RE 26, Corr. Stip. of Undisputed Facts, PageID 239; *see* RE 39-2, Decl. of Pamela DiStefano, PageID 542. The question is whether the Union's specific grievances arise under the 2017 CBA's arbitration clause and therefore trigger the presumption of arbitrability under any of *Litton*'s three exceptions. As explained below, none of the *Litton* exceptions apply, so the district court erred in ordering the parties to arbitration.

**I.**     **The first *Litton* exception does not apply.**

We first consider whether the facts and occurrences leading to the Union's grievances arose before expiration of the 2017 CBA.  *See Litton*, 501 U.S. at 206.  In analyzing whether the first *Litton* exception applies, we have held "that a dispute 'arises under the contract' when a *majority* of the *material* facts and occurrences arose before the expiration of the collective bargaining agreement." *S. Cent.*, 186 F.3d at 740.  "[T]his will necessarily be a case-by-case determination." *Id.*

To illustrate, in *South Central*, we considered whether the parties were required to arbitrate a grievance stemming from an employee's termination that occurred during the period between the effective dates of two CBAs.  *Id.* at 736-37.  There, several material occurrences—including the relevant contractual term outlining employee residency requirements, the initial violation, notification that the employee would be terminated if he did not relocate, and the filing of the grievance—arose before the first CBA expired.  *Id.* at 740.  The employee's actual termination and the lapse of his relocation period occurred after the agreement expired.  *Id.*  Yet we required arbitration because the majority of the material facts occurred before the agreement expired.  *Id.* at 740, 742.

In another case, however, we reversed the district court's order requiring the parties to arbitrate, because even though some of the facts and occurrences occurred before expiration of the parties' agreement, "the occurrences at the heart of the dispute itself" occurred after the agreement expired.  *Stevens-Bratton v. TruGreen, Inc.*, 675 F. App'x 563, 569 (6th Cir. 2017).  The plaintiff in *Stevens-Bratton* sued TruGreen under the Telephone Consumer Protection Act after she received more than ten telemarketing calls following expiration of the parties' agreement.  *Id.* at 566.  Applying *Litton*, we determined that although two material occurrences occurred before the

agreement expired, all the phone calls triggering the dispute occurred after expiration. *Id.* at 569. Because "[t]he phone calls [were] the majority of the material events of the dispute[,] . . . the majority of events occurred *after* the agreement expired." *Id.*

This case is more like *Stevens-Bratton* than *South Central*. The majority of the material facts and occurrences—the alleged violation of the core numbers provision, the failure to elevate transitional employees, and the filing of the two grievances—occurred in August 2021, more than three months after the 2017 CBA expired. That the core numbers provision of the agreement existed before the 2017 CBA expired is immaterial, because "usually the agreement itself . . . is not part of the inquiry of material facts concerning the dispute." *Id.* at 568.

The Union argues that the majority of the material facts occurred prior to May 1, 2021, because "the material fact most relevant to the grievances" is the fact that employees had been "waiting their turn" to transition to full-time employment. CA6 R. 23, Appellee Br., at 24. But the fact that employees hoped that they would transition to full-time employment had nothing to do with whether Kellanova exceeded the core number on a given day. Indeed, there was no guarantee that employees would ever transition, regardless of how long they waited. Therefore, that employees were waiting to transition prior to the 2017 CBA expiring is not a material fact, let alone a majority of the material facts. "[T]he occurrences at the heart of the dispute itself" were the alleged violations of the core numbers provision on August 1 and 2, 2021, when the core numbers provision was no longer in force. *Stevens-Bratton*, 675 F. App'x at 569. Absent these post-expiration occurrences, there would be "no dispute at all." *Id.*

In sum, the majority of the material facts and occurrences arose after the 2017 CBA expired. So the grievances are not arbitrable under the first *Litton* exception.

**II.    The second *Litton* exception does not apply.**

Next, we consider whether the failure to transition employees to full-time employment infringed a right that accrued or vested under the 2017 CBA. *See Litton*, 501 U.S. at 206. We rely on "standard principles of contract interpretation to determine whether a right is vested," and "we might conclude the parties intended a right to vest if we are shown contract language or extrinsic evidence to support that conclusion." *Cincinnati Typographical Union No. 3, Loc. 14519, Commc'ns Workers of Am., AFL-CIO v. Gannett Satellite Info. Network, Inc.*, 17 F.3d 906, 910 (6th Cir. 1994).

The district court determined that Kellanova's refusal to elevate transitional employees to full-time employment status on August 1 and 2, 2021, "necessarily deprive[d] them of an accrued and vested benefit." RE 45, Op. and Order, PageID 589. But neither the district court nor the Union has identified any contract language or extrinsic evidence suggesting that transitional employees had a vested right to full-time employment that persisted after the expiration of the 2017 CBA. And even though the Union's claim is premised on the 2017 CBA, it is significant that the core numbers provision does not appear in the 2021 CBA. In fact, the 2021 CBA adopted a completely new employee structure. This change "tends to indicate that the parties . . . viewed the right as a creature of a particular contract and not as a right vested and thus guaranteed for the future." *Cincinnati Typographical Union*, 17 F.3d at 911.

Further, we are not convinced that the ability to switch from transitional employment to full-time employment based on the core numbers provision is the "type[] of right[] that courts presume to be accrued or vested without any other evidence in a contract." *Id.* (citation modified). It is not a right that employees "accrue [] step-by-step," like severance pay or vacation pay. *Id.* No matter how long transitional employees were "waiting on the ramp" to "move up to regular

status," RE 45, Op. and Order, PageID 589, they were never guaranteed that such a move would occur. These employees would only be elevated when and if Kellanova exceeded the annual caps, which could happen once, more than once, or not at all. Simply put, the Union has not pointed to contract language or extrinsic evidence to show that the parties intended the vesting of a right to elevate to full-time employment. Nor has it pointed to caselaw suggesting that courts have viewed such elevation as a vested or accrued right.

III.     **The third *Litton* exception does not apply.**

Finally, we consider whether the right to transition to full-time employment survived the 2017 CBA's expiration. *See Litton*, 501 U.S. at 206. We again apply "normal principles of contract interpretation" to determine whether a disputed contractual right survives expiration of an agreement. *Id.* "[R]ights may survive the expiration of the collective bargaining agreement if the agreement provides in explicit terms that certain benefits continue after the agreement's expiration." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union 1199 v. Pepsi-Cola Gen. Bottlers, Inc.*, 958 F.2d 1331, 1334 (6th Cir. 1992).

In this case, we need look no further than the plain language of the 2017 CBA, which states that the CBA was in effect until 11:59 p.m. on April 30, 2021. This "general durational clause []  applied to all benefits," including the right to transition to full-time employment, "unless the agreement specified otherwise." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 140 (2018); *see also M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441-42 (2015) (noting the traditional principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement" (quoting *Litton*, 501 U.S. at 207)); *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) ("When a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination." (citing *Litton*, 501 U.S. at 207)).

The 2017 CBA did not include a survival clause stating that the core numbers provision was intended to survive expiration. *See Pepsi-Cola*, 958 F.2d at 1334. As a matter of fact, nothing in the CBA's language suggests that the parties meant to extend the ability to transition to full-time employment under the core numbers provision past April 30, 2021. *See Gallo*, 813 F.3d at 269 ("Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" (citing *Litton*, 501 U.S. at 207)).

The Union directs us to Kellanova's response to the two grievances, in which Kellanova stated, "[p]er [Kellanova's] core number calculation, [n]o transitional employees were eligible to move to Full Time status." RE 26-3, Grievance 219, PageID 314; RE 26-4, Grievance 233, PageID 316. According to the Union, this statement "necessarily agree[s], therefore, that such a core number continued to exist and continued to be material to the grieved issue." CA6 R. 23, Appellee Br., at 29. We disagree. Kellanova's reference to the expired core number calculation did not necessarily mean Kellanova thought the provision survived the CBA. Kellanova could have referred to the core number calculation for other reasons, including, for example, to protect itself from a potential action under the National Labor Relations Act. *See, e.g.*, *Pepsi-Cola*, 958 F.2d at 1336 (finding that Pepsi's processing of grievance under terms of expired CBA despite refusal to arbitrate "support[ed] the inference that Pepsi wished to avoid violating . . . the National Labor Relations Act"); *Int'l Bhd. of Elec. Workers, Local 1200 v. Detroit Free Press, Inc.*, 748 F.3d 355, 358-59 (D.C. Cir. 2014) (relying on *Pepsi-Cola* for the proposition that continued operation under an expired agreement "does not indicate that the agreement itself . . . remained in effect, but only that the NLRB will require a company to continue to adhere to certain obligations").

Even if we construed Kellanova's response as somehow suggesting that the core numbers provision survived expiration, the 2017 CBA's unambiguous language controls. *See, e.g.*, *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208-09 (6th Cir. 2016) ("When the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties." (citation modified)). Neither the language of the 2017 CBA nor Kellanova's responses to the grievances convince us that the right to transition to full-time employment survived expiration of the 2017 CBA.

\* \* \*

The Union's grievances do not meet any of the *Litton* exceptions, and as a result, they did not arise under the 2017 CBA. The presumption of arbitrability thus does not apply, and we need not address whether "the parties negated, either expressly or by clear implication, the presumption that the arbitration clause of the [2017 CBA] extends beyond" its expiration. *S. Cent.*, 186 F.3d at 741; *see Nolde Bros.*, 430 U.S. at 255.

## CONCLUSION

For the above reasons, we reverse the district court's grant of summary judgment to the Union and remand for further proceedings.